(June 15, 1911.)

STATE et al., Plaintiffs, v. THE TWIN FALLS CANAL CO., a Corporation, et al., Defendants.

[121 Pac. 1039.]

CAREY ACT LANDS—SCHOOL LANDS—APPROPRIATION OF WATER RIGHTS —CONSTRUCTION OF CANAL SYSTEM BY CORPORATION—CONTRACT FOR CONSTRUCTION OF IRRIGATION SYSTEM—CONTRACT BETWEEN CONSTRUCTION CORPORATION AND STATE—HOLDING CORPORATION— CONSTRUCTION OF CONTRACT—TRANSFER OF SYSTEM BY CONSTRUCTION CORPORATION TO HOLDING CORPORATION—JURISDICTION—MANDAMUS—LOSS OF WATER BY SEEPAGE AND EVAPORATION—CONSTRUCTION OF STATUTE—WATER RIGHTS—PROPORTIONATE INTEREST— WATER MEASURED AT POINT OF DIVERSION—INTERPRETATION OF CONTRACT—DISTRIBUTION—IN TURN OR BY ROTATION.

(Syllabus by the court.)

1. The Twin Falls Land & Water Co. is a corporation organized under the laws of the state of Utah and authorized to do business in the state of Idaho, its purpose being to acquire water rights and construct irrigation systems and sell water rights in the state of Idaho under what is commonly called the Carey Act, an act of Congress approved February 18, 1894, and acts amendatory thereof, and was organized particularly for the purpose of constructing, operating and disposing of a Carey Act

project in this state commonly called the Twin Falls South Side project, and under the provisions of said act of Congress and the statutes of this state, the state land board, on the part of the state, entered into a contract with said Twin Falls Land & Water Company for the construction of a system of irrigation works for the reclamation of the land included in said Twin Falls South Side project.

2.   Under the provisions of said contract, the Twin Falls Canal Company was organized under the laws of this state for the purpose and object of taking over and holding the title to said canal system and water rights connected therewith, and to operate and hold the same in trust for the settlers and land owners within said project.

3.   Under the terms of said contract the Land & Water Company agreed to sell water for the reclamation of lands owned by the state and embraced within said project:

4.   A contract having been entered into between the Land & Water Company and the Canal Company, whereby the Land & Water Company transferred its entire interests in and to the dams, ditches, water rights, etc., to the Canal Company, and also thereafter transferred to said Canal Company 42,174.51 shares of unsold water rights, and authorized the latter corporation to sell said shares or water rights under the provisions of the original contract with the state, and said Canal Company, upon proper application made by one who had purchased lands of the state embraced within said project, refused to sell the purchaser a water right for the irrigation of the lands so purchased; *held,* under said contract and the law that the Canal Company should be compelled by mandate to issue to such purchaser the water rights prayed for.

5.   The canal corporation was not organized for profit, but was organized for the purpose of carrying out the provisions of said contract and to perform a public duty, and in case of refusal to perform such duty, *held,* that *mandamus* would lie to compel it to do so.

6.   Sections 1615, 1616, 1617, 1618 and 1619, Rev. Codes, cited and construed.

7.   It is the policy of the law of this state to prevent the wasting of water.

8.   In the construction of a written contract, if there is room for doubt as to its true meaning, the facts and circumstances out of which such contract arose should be considered and the contract construed in the light of such facts and circumstances, so that the  intention of the parties to the contract may be ascertained, if possible, and given effect.

9. Certain provisions of said contract cited, commented on and construed.

10. Said contract prohibits water rights or shares to be dedicated to any of the lands included within such project or sold for any lands beyond the carrying capacity of the canal, and in excess of the appropriation of 3,000 second-feet of water, and prohibits the sale of more than one second-foot of water for the irrigation of each eighty-acre tract, and contemplates that said appropriation of water shall be devoted exclusively to the irrigation of lands within said project.

11. Under the provisions of paragraph 9 of said contract, it is provided that one-eightieth of a second-foot is allotted to each acre of land within said project, and the carrying capacity in said canal system sufficient to carry that amount of water for each acre, and a system of distribution by rotation is provided. *Held*, that that system should be used if necessity and the economical use of water requires it.

12. Under the provisions of sec. 3293, Rev. Codes, the users of water are prohibited from using more than good husbandry requires for the proper production of the crop or crops they produce.

13. Although there is no statutory provision for rotation in the use of water, contracts providing for rotation will be enforced by the courts.

14. Under the provisions of said contract, each owner of land is not entitled to a constant flow of one-eightieth of a second-foot of water per acre.

Original application for a writ of mandate to compel the defendants to issue shares of water stock, the water to be used for the irrigation of certain lands purchased by the plaintiff West from the state, and for other proper and equitable relief. Application granted and writ of mandate directed to be issued.

D. C. McDougall, Attorney General, J. H. Peterson, and O. M. Van Duyn, Assistants, for Plaintiffs.

Action in mandate will lie to compel the defendant corporation to issue shares of stock to the plaintiff in accordance with its dedication, its application filed with the state engineer, contract with the state and the right which under our statutes a land owner has to demand the irrigation of his

land from the available water supply upon the payment of a reasonable compensation therefor. (Sec. 4977, Rev. Codes; 26 Cyc. 378; *Haugen v. Albina Light & Water Co.,* 21 Or. 411, 28 Pac. 244, 14 L. R. A. 424; *Merrill v. South Side Irr. Co.,* 112 Cal. 426, 44 Pac. 720; *Cozzens v. North Fork Ditch Co.,* 2 Cal. App. 404, 84 Pac. 342; *Standard. v. Farmers' High Line etc. Co.,* 25 Colo. 202, 54 Pac. 626; *Wheeler v. Northern Colo. Irr. Co.,* 10 Colo. 582, 3 Am. St. 603, 17 Pac. 487; *Golden Canal v. Bright,* 8 Colo. 144, 6 Pac. 142; *McCrary v. Beaudry,* 67 Cal. 120, 7 Pac. 264.)

Where the right rests upon a public duty of the company, its enforcement may be compelled by *mandamus.* (*Perrine v. San Jacinto etc. Co.,* 4 Cal. App. 376, 88 Pac. 293; *Hunt v. Jones,* 149 Cal. 300, 86 Pac. 686; *Clyne v. Benicia Water Co.,* 100 Cal. 310, 34 Pac. 714.)

S. H. Hays, Appearing *Amicus Curiae.*

The procedure by writ of mandate is proper, for the reason that the Twin Falls Canal Co. is not a corporation organized for profit, but simply for the purpose of administering the water supply and managing and maintaining the canal system constructed by the Twin Falls Land & Water Co. The officers and directors of this corporation occupy exactly the same relation to the public as the officers and directors of an irrigation district. While organized as a private corporation, the duties and functions are those of a public corporation exclusively. (19 Am. & Eng. Ency. of Law, 2d ed., 883; 5 Thompson, Corporations, sec. 5775.)

By paragraph 9 of the contract, one-eightieth of a second-foot of water is allowed to each acre, but that allotment, as shown by the original appropriation, is measured at the point of diversion. Such water, however, as is to be delivered to the user is to be delivered at a point within one-half mile of the place of intended use, but only in such quantities as may be needed and under a rotation system. The rotation system is herein specifically provided for by contract, but if it were not and the water supply was short, it would be the duty of the company to provide such system as a neces-

sary economy in distributing the water. This method has been recognized by the courts. (*Wiggins v. Muscupiabe L. & W. Co.,* 113 Cal. 182 (190), 54 Am. St. 337, 45 Pac. 160, 32 L. R. A. 667; *Gutierrez v. Wege,* 145 Cal. 730, 79 Pac. 449.)

The advantage of a rotation system was long ago recognized by this court. (*Helphery v. Perrault,* 12 Ida. 451, 86 Pac. 417.)

In order that there might be no doubt about the obligation, the system to be used under this project was in specific terms defined as a rotation system. Since the decision in the Helphery case, the courts and law-writers have recognized the necessity of rotation. (Wiel, Water Rights in Western States, p. 268; Mills' Irrigation Manual, sec. 87; *Shafford v. White Bluffs L. & I. Co.,* 63 Wash. 10, 114 Pac. 883; *Anderson v. Bassman,* 140 Fed. 14 (29); *Hough v. Porter,* 51 Or. 318, 95 Pac. 732 (752), 98 Pac. 1083, 102 Pac. 728.)

The rotation system is approved by the highest engineering authority. (Buckley, "The Irrigation Works of India," p. 282; Brown on Irrigation, p. 214 et seq.; Wilson's Irrigation Engineering, sec. 67.)

W. H. Puckett, and J. B. Hawley, *Amici Curiae.*

The company which was directly concerned in this contract had the opportunity for making it or assisting in its drafting, and we can safely presume that it had a part in writing it; it is certain that the settler had none. It seems that there is much reason for insisting that a contract be more strongly interpreted against the party who has written it than against one who has had no part in its formation. (Page on Contracts, p. 1122; 2 Parsons on Contracts, 9th ed., pp. 662, 663, and notes; 9 Cyc. 591.)

"The law in force when a contract is made is a part of such contract as fully as if its provisions had been incorporated into such contract." (2 Page on Contracts, par. 1117; 9 Cyc. 582.)

At the time of the making of this agreement, the law of the state recognized that a cubic foot of water, continuous

flow, was the standard of water measurement. (5th Sess. Laws 1899, p. 380, sec. 1; *McGinness v. Stanfield,* 6 Ida. 372, 55 Pac. 1020.)

It was also the law at the time of this contract's execution, "That any person, association, or corporation which may contract to deliver a certain quantity of water to any party or parties, shall deliver the same to such party or parties, together with a reasonable and necessary allowance for loss by evaporation and seepage." (Laws 1895, p. 180, sec. 17.)

Bowen & Porter, for Defendant, the Twin Falls Canal Co.

To make a valid, completed appropriation of water, there must not only be a diversion from the natural stream, but an actual application of it to the soil. (*Fort M. L. & C. Co. v. South Platte D. Co.,* 18 Colo. 1, 36 Am. St. 259, 30 Pac. 1032; *Farmers' Ind. Ditch Co. v. Ditch Co.,* 22 Colo. 513, 55 Am. St. 149, 45 Pac. 444; *Low v. Rizor,* 25 Or. 551, 37 Pac. 82; *Nevada Ditch Co. v. Bennett,* 30 Or. 59, 60 Am. St. 777, 45 Pac. 472; *Conant v. Jones,* 3 Ida. 606, 32 Pac. 250.)

Courts will not grant *mandamus* where rights have already been sold or acquired beyond the capacity of the canal or the appropriation. (*Gerber v. Nampa Irr. Dist.,* 16 Ida. 1, 100 Pac. 80.)

Where a person acquires a right to a water right by contract, and the obligation rests wholly on contract and involves no legal or official duty made such as a matter of law, and there are no special reasons why the plaintiff has no plain, speedy or adequate remedy in the ordinary course of law, *mandamus* will not lie. (*State v. Washintgon Irr. Co.,* 41 Wash. 283, 111 Am. St. 1019, 83 Pac. 308; *Florida Central R. Co.,* 31 Fla. 482, 34 Am. St. 30, 13 So. 103, 20 L. R. A. 419; *Perrine v. San Jacinto W. Co.,* 4 Cal. App. 376, 88 Pac. 293.)

Before a person can acquire a right under constitution and statutes, it must appear that water is available to supply his demands. No such showing is made in this case. (Rev. Codes, sec. 3289; *Bardsly v. Irr. Co.,* 8 Ida. 155, 67 Pac.

428 (1901); *Cozzens v. Ditch Co.,* 2 Cal. App. 404, 84 Pac. 342; *Gerber v. Nampa Irr. Dist., supra.*)

*Mandamus* will not lie to compel a corporation or its officers to issue stock or a certificate of stock, or to allow a subscription for shares of its stock, or to transfer on the books, as the remedy at law or in equity is plain, speedy and adequate. (26 Cyc. 347; *State v. Carpenter,* 51 Ohio St. 83, 46 Am. St. 556, 37 N. E. 261; *Kimball v. Water Co.,* 44 Cal. 173, 13 Am. Rep. 157.)

It will not lie to secure a perpetual water right. (*Townsend Ditch Co. v. Ditch Co.,* 17 Colo. 143, 29 Pac. 453.)

SULLIVAN, J.—This is an action brought by the state of Idaho and H. T. West as plaintiffs, against the Twin Falls Land & Water Company, a corporation, and the Twin Falls Canal Company, a corporation, praying for a writ of mandate against the defendant corporations, requiring them to issue shares of water stock to the plaintiff West, who is a purchaser of state land under the irrigation project of said corporations, and also to issue shares of water stock to other land owners in the same status, and also praying for such other equitable relief as may be just.

The plaintiff sets up substantially the following state of facts, and alleges that the Twin Falls Land & Water Co. is a corporation organized under the laws of the state of Utah and authorized to do business in the state of Idaho, its purpose being to acquire water rights and to construct dams, canals, ditches and a complete irrigation system and sell water rights in the state of Idaho under what is commonly called the Carey Act, an act of Congress approved August 18, 1894, and acts amendatory thereof (Vol. 6, Federal Stat. Ann., p. 397), and for the purpose particularly of constructing, operating and disposing of a Carey Act project in the state of Idaho, commonly called the Twin Falls South Side project. Said Twin Falls Land & Water Co. will hereafter be referred to as the Land & Water Company.

The Twin Falls Canal Company is a corporation organized under the laws of the state of Idaho and authorized

to do business therein, with a capital stock of 240,000 shares, its object and purpose being to take and hold the title to and operate certain dams, canals, laterals and other works constructed by said Land & Water Company for the irrigation of the land included within said Twin Falls South Side project, which main canal takes water from Snake river at a point particularly described in the complaint, and to acquire from said Land & Water Company all its right to the appropriation of water made by said Land & Water Company for use on said South Side project, and to acquire, hold, maintain and distribute among its stockholders and others equally and ratably the water diverted from said Snake river pursuant to the appropriation of the said Land & Water Company, and to fix charges for said water among its stockholders and others using said water or entitled thereto, and to do other and various things more fully described in the complaint, the express purpose of said corporation being to receive from the said Land & Water Company the title to the canals, dams and franchises of said last-named corporation, and to manage them for its shareholders.

Within said irrigation project, the state of Idaho owns school lands in considerable quantity, said land being dry and arid and practically valueless without water for its irrigation. On the 18th of June, 1910, the state of Idaho sold to the plaintiff West the N. W. 1/4 of the S. E. 1/4 of Sec. 16, Tp. 11 S., R. 18 E. of B. M., and issued to him a certificate of sale of said school land. The application of the Land & Water Company for segregation of the land included in said South Side project under said Carey Act, bears date October 12, 1900, and proposes to irrigate, among other lands, the particular forty acre tract above described, and one of the prime reasons assigned by the applying company for the segregation, and one of the considerations which moved the land board to grant the segregation to said company, was that the state owned some 18,000 acres of land within the said project, and on the 2d day of January, 1905, the state of Idaho entered into a contract with the said Land & Water Company for the reclamation of the land owned by the state

under said project.   The terms upon which water was to be sold by said Land & Water Company for the reclamation of the state's land was $15.50 an acre, provided the applications therefor were made within one year after the date of the purchase of said land from the state; otherwise, $25 an acre.   In the meantime the Land & Water Company had made application to the state engineer for a permit to appropriate 3,000 cubic feet of water per second of time of the public waters of this state flowing in Snake river, for the purpose of irrigating lands embraced in the proposal above referred to, including the state's school lands within said project, and the state engineer granted his permit to said company on condition that said company fulfill all the terms and conditions for the proposal for segregation, among which was the irrigation of the state's land included within said segregation.

Moved by the above considerations, the state land board accepted the proposal of the said Land & Water Company and took the necessary steps prescribed by said Carey Act to procure the segregation of said lands from the federal government.   One of the provisions of the contract between the said Land & Water Company and the state was that there should be formed a corporation known as the Twin Falls Canal Company, to which corporation the Land & Water Company should convey its entire holdings, consisting of dams, canals, laterals, water rights, etc., and that shares of stock bargained for or contracted for with the Land & Water Company should be replaced by shares in said Canal Company, share for share.   It was deemed necessary by the state to provide a convenient method of transferring the ownership and control of said dam and canal system and water rights, after its completion, from the said Land & Water Company to the purchasers of shares or water rights in said canal, and said Canal Company was formed as a holding company for that purpose.

Pursuant to these considerations and in view of these contracts, the Land & Water Company constructed its dam and irrigation works sufficient to divert the water applied for to

the state engineer, and in accordance with its contract, subsequently transferred all of its holdings to the Twin Falls Canal Company. At the time of turning over the said system to the said Canal Company, there remained unsold 42,174.51 shares of stock in the Land & Water Company, each share representing a maximum water right of one-eightieth of a cubic foot per second for each acre of land remaining unsold, and there remained unsold at that time an amount of land sufficient to utilize said water and the shares of stock, among which land was the portion of said section 16 now owned by plaintiff West, and this amount of water stock was held in reserve to be applied to said land when it should pass into private hands.

By the terms of the contract between the state and the Land & Water Company, the water appropriated was dedicated to the lands segregated and to the school lands within the segregation. It is alleged that the land owned by plaintiff West cannot be irrigated from any other source than the ditches and laterals of the defendant company, and that the said land is worthless without water to irrigate it, and that the plaintiff West has requested the Canal Company to deliver shares of stock to him in accordance with its contract with said Land & Water Company and the state of Idaho and in accordance with the company's dedication, and that said company has refused and still refuses to deliver water or to issue shares of stock to the plaintiff West. It is also alleged that the plaintiff is the real party in interest in this case and that he has no adequate remedy by suit at law.

The defendant Land & Water Company failed to appear and answer, but the Canal Company appeared and filed a motion to strike out portions of the complaint, also a demurrer and an answer denying some portions of the complaint and alleging some new facts, and formally objecting to the jurisdiction of the court.

It is admitted by the answer that there had been sold by the Land & Water Company 197,821.74 shares of water rights in said system, and it is averred that each share or water right so sold or delivered represents the right to re-

ceive and have delivered to the holder of the same one-eightieth of one second-foot of water to be delivered within one-half mile of the place of intended use; that all of the water rights in said canal have been sold, and there now remains no water or water rights in the said canal system which can be sold by either of said defendants; that while there has been returned to this defendant from the Land & Water Company 42,174.51 shares of the capital stock (which number of shares are now in the treasury of the Canal Company), there is no water or water rights available under and by virtue of the said appropriation or otherwise or at all, and that for such reason the Canal Company cannot sell or dispose of said stock. The foregoing defense set up by the answer embraces the main contention in this case.

It is first contended that this court has no jurisdiction to hear and determine this matter, and that mandate will not lie to compel the Canal Company to issue shares of stock to the plaintiff under the issues made by the pleadings. Under the provisions of sec. 4977, Rev. Codes, mandate may be issued "by any court except a justice's or probate court, to any inferior tribunal, corporation, board or person, to compel the performance of an act which the law especially enjoins as a duty resulting from an office, trust or station."

In the case of *Haugen v. Albina Light & Water Co.,* 21 Or. 411, 28 Pac. 244, 14 L. R. A. 424, application was made for a writ of mandate to compel the water company to furnish water to others than the original purchasers, and in the decision of the case the court discussed at considerable length the duty owed by public corporations to the public, and quoted with approval from 2 Morawetz Priv. Corp., sec. 1129, as follows:

"It may be laid down as a general rule, that whenever the aid of the government is granted to a private company, in the form of a monopoly or a donation of public property or funds, or a delegation of the power of eminent domain, the grant is subject to an implied condition that the company shall assume an obligation to fulfill the public purpose on account of which the grant was made. . . . . . The rule

applies to companies invested with special privileges, at the expense of the public, for the purpose of supplying cities with water."

And the Oregon court said:

"The pipe was laid along the street and in front of the lot of the plaintiff under the franchise granted by the city, and by the terms of its incorporation, to supply water to the city and to its inhabitants. This being a public purpose, and the business of a public nature, the defendant must serve all alike, and for any discrimination *mandamus* is the appropriate remedy."

The canal corporation is not one organized for profit, but is one organized really for the purpose of performing a public duty. The stock of that corporation represents the right to the water, and a refusal to deliver the stock amounts to a refusal to deliver water and a refusal to perform the public duty for which the corporation was organized. *Mandamus* is therefore a proper remedy. (5 Thompson on Corporations, sec. 5775.)

This action is in effect to compel the performance of a public duty. The canal corporation was organized under the supervision of the state for the purpose of carrying out a certain duty resulting from a trust, and if the facts warrant, this court has ample jurisdiction to compel the said canal corporation by mandate to perform the acts prayed for in the petition.

The principal question for consideration is whether under the facts presented the court will compel the Canal Company to sell water rights to the purchasers of state lands. It is contended by counsel for the Canal Company that the water rights already sold in said system amount to 197,821.74 shares, which shares represent water rights amounting to 2,472.60 second-feet of water, and it is contended by counsel for the Canal Company that the Canal Company must deliver that amount of water to its various stockholders one-half mile from the farm unit, or place of use; that said company owns a 3,000 second-feet water right; that that is the maximum amount of water which it can divert and convey, first, be-

cause of prior appropriators using all of the water of Snake river, and second, because the main diverting canals will not convey more, the canals having only a 3,000 second-feet capacity; that the loss by evaporation, seepage, etc., from the head of the canal to the point of delivery and place of use is about thirty per cent of the water that enters the canal at its head, and thirty per cent of 3,000 is 900, thus leaving but 2,100 second-feet of water after deducting said loss, for use by all owners of water rights, and according to that computation, there has already been sold 372.6 cubic feet of water per second of time more than remains in said canal after deducting the thirty per cent loss, thus giving to the owners of water rights much less water than one-eightieth of a second-foot of water per acre, as provided by said contract. It is averred by counsel that as soon as the actual water right holders became the owners of the capital stock of the Canal Company, steps were taken to prevent the further sale of water rights by the Land & Water Company, and finally an agreement was made whereby the Land & Water Company transferred to the Canal Company the remaining unsold stock, in trust, which the Canal Company now holds, and refuses to sell said shares because there is no water to supply such shares, and for no other reason.

Under the facts of this case and said contract entered into between the state of Idaho and the Land & Water Company, has the Canal Company the right to refuse to sell and issue the shares of stock claimed by the plaintiff West and the state? In order to determine this question, we shall have to consider at some length said contract and the law under which said contract was made.

The Land & Water Company filed its proposal to construct said irrigation works under the provisions of sec. 1615, Rev. Codes. Under that section it is provided that the proposal shall state:

"The source of water supply, the location and dimensions of the proposed works, the estimated cost thereof, the price and terms per acre at which perpetual water rights will be sold to settlers on the land to be reclaimed, said perpetual

rights to embrace a proportionate interest in the canal or other irrigation works, together with all the rights and franchises attached thereto.''

The term ''rights and franchises'' as used in that section means water rights as well as all other rights, including dams, canals, ditches, laterals, etc., and the interest which the purchaser of a water right has, not only in the irrigation works, but in the water rights as defined by that section of the statute, is a ''proportionate interest.'' Thus said statute contemplates that each owner of a water right has a proportionate interest in said entire irrigation works.

Sec. 1617, Rev. Codes, provides that a permit to appropriate water must be obtained from the state engineer, which was done in this case. Under the provisions of sec. 1618, the proposal and request presented by an applicant must be submitted to the state engineer for his report thereon, and under sec. 1619, if the project is approved by the state engineer, the matter is then presented to the state land board for approval, and if approved, by the provisions of sec. 1621, proper application is made to the Department of the Interior for the withdrawal of the lands, and after the same are withdrawn the state may then enter into a formal contract for the construction of irrigation works with the party making the application.

The proposal and request provided for by sec. 1615 must contain, among other things, the following matters: (1) A list of the lands by legal subdivisions included within such project; (2) A certificate of the state engineer that application for a permit to appropriate water has been filed in his office and his report thereon; (3) A statement of the source of the water supply; (4) The location and dimensions of the proposed works; (5) The estimated cost thereof; (6) The price and terms per acre at which water rights will be sold, said rights to represent a proportionate interest in the irrigation system; (7) The name of the company proposing to build the project if incorporated; (8) The purpose of its incorporation; (9) The names and places of residence of its

directors and officers; (10) The amount of its authorized and of its paid-up capital.

The report which the state engineer, under the provisions of said sec. 1618, must make, is required to cover the following points: (1) Whether or not the proposed works are feasible; (2) Whether the proposed diversion of the public waters of the state will prove beneficial to the public interest; (3) Whether there is sufficient unappropriated water in the source of supply; (4) Whether or not a permit to appropriate water has been approved; (5) Whether the capacity of the proposed works is adequate to reclaim the land described; (6) Whether or not the proposed cost of construction is reasonable; (7) Whether the maps filed are in due form; (8) Whether the lands proposed to be irrigated are desert in character.

The report of the state engineer, being laid before the board, together with the proposal and request of the applicant, the next step in the procedure is the action to be taken by the state land board as provided by sec. 1619. If the report of the state engineer is favorable, the board may then approve or disapprove the application. If it approves the application, it may then enter into the contract with the construction company for the construction of the irrigation works. The term of the contract for the construction of the works is limited to five years. Under the provisions of the statute, the completing of said works is supervised by the state and ultimately the works must be turned over to the settlers, thereby providing a kind of municipal ownership.

Under the rules and regulations of the land board adopted October 16, 1909, the relation of the builder of the works to the project is set forth as follows:

"The company entering into this contract with the state is related to the undertaking simply as a construction company, whose duty it will be under the provisions of the state law and the terms of the contract to build a canal under the supervision of the state, the money spent in such construction being secured by the land which the canal is designed to irrigate."

In the case at bar a request and proposal for the construction of irrigation works was filed by said Land & Water Company with the state land board commissioners on the 12th of October, 1900. In that proposal it was stated that the South Side canal, the one here in question, would have a length of sixty-five miles; that the first section would be ninety feet wide on the bottom, gradually narrowing to sixty feet at Rock creek; that the slopes of the sides would be one and a half to one; that the depth of the water would be nine feet; that the grade would be one foot in five thousand, and the capacity 3,000 second-feet. It was specifically provided in this proposal that the price at which shares should be sold to purchasers of state lands should not exceed $15.50 per share, a share being the amount of water for one acre of land. Accompanying that proposal was a copy of the water right location dated October 11, 1900, for 3,000 second-feet of the waters of Snake river. This proposal and request having been referred to the state engineer for report, that officer on October 12, 1900, filed his report, a part of which is as follows:

"The land which it is proposed to irrigate is situated in the north part of Cassia and the south part of Lincoln county in the Snake River Valley.

"The main body, about 240,000 acres, lies on the south side of Snake River from Twin Falls westward, while a smaller body of about 31,000 acres lies on the north side of the Snake from Twin Falls eastward, being tracts of desert land which until very recently were thought to be unreclaimable. Of the total area of about 271,000 acres, 20,000 acres are state lands, 2,700 are private lands and 248,676 acres belong to the public domain. The state is asked to apply for the segregation of these public lands under the provisions of the Carey Act. Of the vacant public lands, about 153,000 acres are surveyed.

"These lands are favorably situated, almost surrounding the Twin and Shoshone Falls, two of the greatest waterfalls in the world. They are of excellent quality, and when reclaimed by irrigation should be very productive.

"The water supply will be obtained from the Snake river and will be adequate for the irrigation of these lands during all seasons. I have granted a permit to the Twin Falls Land and Water Company to appropriate 3,400 second-feet of the water of Snake river for the irrigation of the lands which they ask to have segregated, together with other lands which are susceptible of irrigation from the proposed works. . . . .

"The South Side canal will be about sixty-five miles in length, ninety feet on the bottom at the head, and will have a capacity of 3,000 second-feet."

It will be observed from said report that the area of the land to be irrigated on the south side of the river under the canal system involved in this case is about 240,000 acres, and that for the irrigation of this land, as shown by the water right notice, 3,000 second-feet had been provided; or, in other words, a water supply of one-eightieth of a second-foot for each acre of land was to be taken from Snake river at the point of diversion. The capacity of the canal also, as reported by the state engineer, conforms to the water right appropriation of 3,000 second-feet of water. The report of the state engineer was accepted and the land was finally segregated. A formal contract between the state and the United States was executed July 1, 1901. Some difficulties remained to be met by the Land & Water Company, but on January 2, 1903, a formal contract between the state and the Land & Water Company was executed. The first paragraph of this contract entitled "Purpose of Contract," provides that the Twin Falls Land & Water Company should "Sell shares or water rights in said canal system from time to time as hereinafter provided, to the persons filing upon the lands hereinafter described and to the owners of other lands not described herein but which are susceptible of irrigation from this canal system, said shares or water rights to be sold on the terms herein provided."

A list of the Carey Act lands in said project was attached to the contract, but the "other lands" referred to therein are the state lands and private lands mentioned in

the report of the state engineer. These lands were also shown upon the map which accompanied the contract. There was, therefore, at the time of making said proposal and at the time of the execution of said contract between the state and the Land & Water Company no misunderstanding or doubt as to the amount of water to be diverted at the head-gate, or as to the amount of land to be irrigated under the South Side canal. The construction of said project was completed in the year 1909, and in the fall of that year the construction company conveyed to the Canal Company the irrigation system here in question, said Canal Company having been organized as a holding company for the owners of said water rights. Said conveyance was made after a report by the state engineer dated September 22, 1909, in which he recommended that the transfer of the system and works be made, with the understanding that the Land & Water Company turn over to the Canal Company, the new management, $7,500 in cash to make certain repairs specified and set forth; and the engineer further stated that his recommendation carried with it the approval of the system in its general condition.

To recapitulate: The record shows a request and proposal presented by the Land & Water Company for the construction of said irrigation works; a favorable report by the state engineer; the approval of the report and proposal; the segregation of the lands by the United States; the making of the contract between the state and the construction company; the completion of the works and the final turning over of the canal system and water right after a favorable report by the state engineer to the defendant, the Canal Company. We have here, then, a contract made and completely executed. The conveyance of said system was accepted by the Canal Company. At the time of the transfer the construction company (The Land & Water Company) had not yet sold water rights for all of the lands under the canal system, and included in the lands not sold was a considerable portion of the school lands. The Land & Water Company thereafter continued to sell water rights from time to time. Under this

state of facts the Canal Company, which is a corporation composed of the settlers to whom the canal system had been conveyed by the Land & Water Company, on September 15, 1910, nearly a year after the completion of the canal, its acceptance by the state and its conveyance by the Land & Water Company by its proper officers, presented an application to the state land board requesting that said board prevent the further sale of water rights by the Land & Water Company, which application and order of the board thereon are as follows:

"To the Hon. State Land Board, Boise, Idaho:

"We beg to call your attention to a section of the contract between the state of Idaho and the Twin Falls Land & Water Company made January 2d, 1903, wherein it says:

"'But in no case will water rights or shares be dedicated to any of the lands before mentioned or sold beyond the carrying capacity of the canal system, nor in excess of the appropriation of the water, as hereinbefore mentioned.'

"Owing to the fact that their appropriation is but 3,000 second-feet and after allowing 30 per cent for seepage and evaporation, there is left but 2,100 second-feet and that said land and water company has sold approximately 195,000 acres, we respectfully ask that no more sales of land be approved by you until after a thorough investigation has been made by your board, and not then unless it is clearly demonstrated that there is yet water left for sale.

"TWIN FALLS CANAL COMPANY,
"T. WIGGLESWORTH, Pres.
"G. E. HARLAN, Gen. Mgr."

"The board ordered that the Twin Falls South Side Land & Water Company be notified not to sell any more water until their water supply could be investigated by the board, at which time they would be notified. It was further ordered that the contracts entered into before this date would be approved."

On the 18th of November, 1910, the board entered an order rescinding the above order of September 15th so far as it ap-

plied to the water rights sold to the state prior to the date of the order, but denied any modification as to other lands. After some further negotiations a settlement was arrived at between the Land & Water Company and the Canal Company, the substance of which was that if any further water rights were sold the proceeds would be equally divided between the two companies.

The refusal of the Canal Company to sell any further water rights and to issue any of said 42,174.51 shares of stock is based upon the facts that the appropriation for said entire project only amounts to 3,000 second-feet of water; that there are losses of thirty per cent by evaporation, seepage, etc., and that the requirement of the contract is for the delivery of one-eightieth of a second-foot of water within a half-mile of each 160 acre tract, and for that reason the water right has been exhausted by the sale of 197,821.74 shares of water rights in said system, as the appropriation amounts only to 3,000 second-feet for 240,000 acres of land, or one-eightieth of a second-foot for each acre of said land at the point of diversion from said river. In water appropriations and water permits the statute requires a statement of the amount of water to be appropriated at the point of diversion (sec. 3249, Rev. Codes). In *Stickney v. Hanrahan,* 7 Ida. 424, 63 Pac. 189, the court said: "Under the law, water of all claimants must be measured at the point where such water is diverted from the natural channel of the stream from which it is taken. This is a matter of necessity demanded by public policy. It is the policy of the law to prevent the wasting of water."

It was certainly well known that there would be considerable waste of water from the point of diversion in carrying much of the water through hundreds of miles of canals and laterals to the place of use. On the other hand, by using what is known as the "coulee" system, much of the waste water of this entire system may be utilized over and over again, thereby largely offsetting canal losses by evaporation and seepage. Coulees are small, rocky depressions or draws cutting across the Twin Falls tract, generally in the direction of Snake river. These draws or coulees in the spring are

small natural waterways and are found at a distance of three or four miles apart extending across said tract. They serve the purpose of furnishing drainage and also affording an opportunity of utilizing the drainage and waste water a second and often a third time. During the process of irrigation the water runs off the irrigated lands situated on the ridges between the coulees and every two or three miles along their course there are dams placed across such coulees to take up the waste water and turn it into ditches for use again. The coulees are not used for waste water alone, but are used as main ditches as well. Being natural waterways, there is very little, if any, seepage or loss. They do not have ditch banks and can be easily utilized for the flow of water in the wintertime for the purpose of watering stock; so in many ways they are a very desirable and useful part of that canal system, particularly as there is little loss from seepage and because they afford an opportunity of utilizing the water over and over again. It has been estimated that by the use of this coulee system about twenty per cent of the water turned out by the canal upon the land is used a second or even a third time. This would give the same result as if the main canal had twenty per cent additional water as well as capacity, and it is contended that twenty per cent of water thus saved, and the saving on account of there being no necessity for irrigating the public highways and other lands on which no crops are produced within said project, would nearly, if not entirely, offset the thirty per cent loss referred to. If that contention be correct, the said system would have water sufficient to give a continuous flow of one-eightieth of a second-foot of water to every acre of land within said project that is used for raising crops, and the engineers in designing the said irrigation system may have used this method of figuring as an offset to the seepage and evaporation losses.

However, it is contended by counsel for the Canal Company that the contract with the Land & Water Company was for the delivery of one-eightieth of a second-foot of water, continuous flow, for each acre of land within a half mile of each

quarter section of land, and we will now consider the pro-visions of said contract and ascertain whether that contention is correct.

In order to fully understand said contract, we must take into consideration the facts and conditions and circumstances which confronted the parties at the time it was made, the general plan and design of said irrigation works and all of the stipulations of the contract. This court held in *Burke Land etc. v. Wells, Fargo & Co.,* 7 Ida. 42, 60 Pac. 87, that in the construction of a written contract, if there is room for doubt as to its true meaning, the facts and circumstances out of which such contract arose should be considered and the contract construed in the light of such facts and circum-stances. It is the universal rule in the construction of con-tracts that the intention of the parties to the contract should be ascertained, if possible, and given effect. It certainly was clearly understood that said project contained 240,000 acres of land; that the appropriation of water was 3,000 second-feet at the point of diversion on Snake river, giving a constant flow of only one-eightieth of a second-foot per acre at said point of diversion. The contract was evidently made with the full knowledge that all of said 240,000 acres was not at the exact point of diversion.

The Land & Water Company agreed, among other things, in paragraph 1 of said contract ''to sell shares or water rights in said canal system from time to time as hereinafter provided, to the persons filing upon the lands hereafter described, and to the owners of other lands not described herein, but which are susceptible of irrigation from this canal system, said shares or water rights to be sold on the terms herein provided, and to transfer the ownership, management and control of said system to said purchasers of shares or water rights as hereinafter provided.'' Paragraph 2 of said contract con-tains general specifications for the construction of said system, and contains, among other things, the following provisions: ''The main canals of this system shall have a carrying capa-city when completed sufficient to deliver simultaneously one second-foot of water to every eighty acres of land described

in this contract, together with all other lands susceptible of irrigation from said canals as nearly as the same can be estimated and agreed upon between the state engineer and the engineers of the second party.''

By the sixth paragraph of said contract the state agrees as follows: '' . . . . that it will not approve any application for or filing on said lands until the person or persons so applying shall furnish to the said board a true copy of the contract entered into with the said party of the second part for the purchase of sufficient shares or water rights in said irrigation works,'' and the Land &. Water Company agrees ''that to the extent of the capacity of the irrigation works, and as rapidly as lands are opened for entry and settlement, it will sell, or contract to sell, water rights or shares for lands to be filed upon to qualified entrymen or purchasers, without preference or partiality other than that based upon priority of application.''

The right to enter Carey Act land is governed by the provisions of sec. 1626, Rev. Codes, and in paragraph 7 of said contract the state ''agrees to sell the lands herein described to such persons as are or will be by law entitled to file upon the same for the sum of fifty cents per acre.''

By the provisions of paragraph 8 of said contract, the Land & Water Co. agrees that ''it will sell or cause to be sold to the person or persons filing upon any of the lands herein described or to the owner of other lands not described herein, but susceptible of irrigation from its said canal system . . . . a water right or share in the said canal for each and every acre owned, filed upon or purchased from the state. Each of said shares or water rights shall represent a carrying capacity in said canal sufficient to deliver water at the rate of one-eightieth of one second-foot per acre, and each share or water right sold shall also represent a proportionate interest in the said canal together with all rights and franchises based upon the number of shares finally sold in the said canals.'' This paragraph of the contract is a specific promise to sell water for state lands.

The carrying capacity of the canal is 3,000 second-feet. The appropriation was for 3,000 second-feet. The plan of the operation of said irrigation system after its completion also provided for the formation of a corporation to take over the title and ownership of the irrigation system, the water rights being represented by shares of that corporation. That corporation, the Canal Company, was formed and the canal system turned over to it, as above stated. It is provided in said contract after the canal shall be turned over to the operating company, as follows: " . . . . from and after the date of the formation of said corporation, the party of the second part shall sell to purchasers or owners of lands under the canal system, shares of stock of said corporation upon the same terms in all respects as hereinbefore provided for the sale of water rights or shares prior to the formation of such corporation."

In paragraph 9 of said contract it was provided that the certificates of stock in the Canal Company should contain the following provisions: "Shall each upon being issued to the purchaser or holder of land under the canal system be made to indicate and define in the contract or certificate, as the case may be, the amount of water, to wit: one-eightieth of a second-foot, allotted to each acre represented thereby and a carrying capacity of the canal sufficient therefor; the water to be delivered from the canal during each and every irrigation season, said amount to be measured at or within one-half mile of the place of intended use in such quantities and at such times as the condition of the soil, crops and weather may determine, but according to such rules and regulations based upon a system of distribution of water to the irrigators in turn and by rotation as will best protect and serve the interests of all the users of water from this canal system. It is agreed that said system of distribution by rotation shall be devised by the said party of the second part and used by it during the period while it retains the management of said system, and that it shall meet the approval of the state engineer."

By said paragraph one-eightieth of a second-foot of water is allowed to each acre, but that allotment under the appropriation of water would not be sufficient for a continuous flow unless measured at the point of diversion of said canal at Snake river, as it requires 3,000 second-feet of water to give one-eightieth of a second-foot to each of 240,000 acres of land. But it is clear from the whole contract that one-eightieth of a second-foot of water, or five-eighths of an inch, constant flow, could not be delivered within a half-mile of each 160 acre tract, for after deducting thirty per cent for waste of the 3,000 second-feet, there would be but 2,100 second-feet remaining to be distributed to 240,000 acres of land, leaving out of consideration the waste water utilized by said coulee system. Thus it is made to appear there would remain after said loss but seven-sixteenths of an inch per acre constant flow to be measured within a half-mile of each one hundred and sixty acre tract.

The provisions to be contained in said certificates of stock, above quoted, if taken alone, may be a little obscure, but taking the whole contract together, it does not provide for a constant or continuous flow to each eighty acre tract of a cubic foot of water per second of time, for, as above shown, said water right and system were not sufficient to deliver a constant flow of that amount of water after deducting the loss of water occasioned by seepage and evaporation. The latter part of the last-quoted paragraph of said contract does not contemplate that a constant flow of a second-foot of water should be measured to each eighty acre tract within one-half mile of such land, but provides that it shall be measured "at or within a half-mile of the place of intended use in such quantities and at such times as the condition of the soil, crops and weather may determine, but according to such rules and regulations based upon a system of distribution of water to the irrigators in turn and by rotation as will best protect and serve the interests of all the users of water from this canal system." Said provision clearly contemplates that the irrigators shall use said water "in turn" or "by rotation," if that method will best protect and serve the interest

of all users of water from that system. It clearly appears
that it would be impossible, under said appropriation and
the canal system, to deliver continuously to each eighty acre
tract within said project one second-foot of water per second
of time, and the only way that each shareholder can have
five-eighths of an inch of water for each acre of his land
is "in turn" or "by rotation," as above shown. It was
agreed in said ninth paragraph of the contract "that said
system of distribution by rotation shall be devised by the said
party of the second part and used by it during the period
while it retains the management of said system." Thus it
clearly appears that the distribution of water from said system
was intended, if necessity required it, to be by "rotation"
upon a plan to be devised by the Land & Water Company,
which right it has transferred to the defendant, the Canal
Company.

By the tenth paragraph of said contract the Land & Water
Company agreed as follows: "To construct and until it shall
convey and turn over the title and possession to the Twin Falls
Canal Company, Limited, to operate said canal and main lat-
erals so that water conducted through the same may be de-
livered at a point not exceeding one-half mile from any legal
subdivision of 160 acres of land herein described, filed upon,
owned or occupied as aforesaid and to be irrigated or re-
claimed by the water conducted through said canals and main
laterals. . . . . It is hereby agreed that every purchaser of
shares in said canal or holder of stock in said Twin Falls
Canal Company, Limited, shall be entitled to have delivered
for the irrigation of his land, its full amount of water as
herein provided." This stipulation cannot be complied with
except by "rotation."

Paragraph 11 of the contract provided for an increase
in the capacity of the canal and for an enlargement of the
system under certain circumstances, also for the mortgaging
of the system. Paragraph 12 provides for the maintenance
of the system and the payment of any deficiency in mainte-
nance by the construction company. Paragraph 13 provided
for the completion of the work in five years and for a suitable

rate of progress during that period of time. Paragraph 14 provided for forfeiture in case of noncompletion of the work.

Under the provisions of said contract, counsel for the Canal Company contend that water rights have been sold to the full carrying capacity of said system, and to sell any further water rights would be in violation of the provisions of paragraphs 6 and 8 of said contract. The provisions of said contract frequently refer to the canal capacity and provide that it must be sufficient to deliver to the users at least a cubic foot of water per second of time for each eighty acre tract, but do not provide for a continuous flow of that amount of water. The canal, under the terms of said contract, was to have a carrying capacity at its head of 3,000 second-feet. It is not disputed that it has such capacity. The Canal Company now contends or claims that a larger canal should have been provided for, but as the canal is of the capacity provided for by the contract, a greater capacity cannot be insisted upon under the terms of the contract, and it is conceded that the present system is of sufficient capacity for the proper distribution of the 3,000 second-feet of water that was located and appropriated at the head of the canal for the reclamation of the land within said project. The engineer in designing said irrigation system must have taken into consideration the condition of the soil and climate, the amount of water necessary for the proper irrigation of all of said land included within said project required to be irrigated, and also the fact that there would be many thousands of acres in said project required for roads, highways, railroads, barnyards, stackyards, buildings, high points and rocky untillable land, land along fences, and other lands on which crops are not raised, which it is estimated would total about 25,000 acres. These facts were no doubt considered as well as the probable loss from evaporation, seepage, etc., in conducting the water to the place of intended use, and it was concluded that 3,000 second-feet of water at the point of diversion on said canal was sufficient for that purpose. The Land Department of the United States must have considered those facts before it came to the conclusion that said amount of water was suffi-

cient to reclaim said land. If it had not come to that conclusion, it would not have segregated the land included in said project on the showing made by the state. The state land board must have concluded from those facts that the water appropriated was sufficient for the reclamation of said land or it would not have entered into said contract for the construction of said irrigation system. And further, there is nothing in the record to show that said amount of water is not amply sufficient to properly irrigate all of said land if used in turn by the owners of the land or under a proper system of rotation.

It is a well-recognized fact that in order to properly irrigate land, the irrigator must have a proper stream or head of water, and the question arises as to how much water is necessary to furnish a sufficient head or stream for that purpose. I think it will not be disputed that an inch to the acre, if measured out in a constantly flowing stream, is not sufficient for the proper irrigation of a small tract; so for the proper irrigation of small tracts of land there is needed a head or stream of water of sufficient size to be efficiently handled and flowed over the land. It is more convenient and economical to use water in as large heads or volumes as can be conveniently used by the irrigator. Much of the land in the Snake river valley is of the character or kind that unless you have a sufficient head of water to rush it over the land, the sandy and gravelly soil will absorb all of it and not permit it to pass on over the land. Hence to successfully irrigate land, a sufficient head of water is required to flow entirely over the land. A second-foot of water, which consists of about fifty miner's inches, is as small a stream or head of water as can be efficiently used in the irrigation of the lands in the Snake river valley, and it would seem that that matter was considered when it was provided by said contract that a second-foot, or fifty miner's inches, of water was sufficient for an eighty acre farm. The eighty acre farm was apparently the unit of measurement used in designing said irrigation system, and as appears from said contract, the contracting parties had in mind the rotation system, rather

than a continuous flow of water. Take, for instance, the forty acre farm, of which there are many within said project. The water right connected therewith would consist of one-half of a second-foot of water or twenty-five inches, and actual experience has demonstrated, and the history of irrigation in the state shows, that forty acres cannot be successfully irrigated for the purpose of raising grain and hay crops with a constant flow of twenty-five inches of water, most of the soil being such that twenty-five inches is not a sufficient head to efficiently irrigate forty acres and carry the water entirely over the tract. Under the rotation system, if two farmers, each owning a forty acre tract, combine their water and each use it, say, ten days at a time, the eighty acres could be irrigated in less time and more efficiently than if each used twenty-five inches separately and continuously. On much of the land within the state but very little could be accomplished in irrigation with one-half of a second-foot or a twenty-five inch flow of water.

The defense calls special attention to a part of paragraph eight of the contract, which is as follows: "But in no case will water rights or shares be dedicated to any of the lands aforementioned or sold beyond the carrying capacity of the canal system, nor in excess of the appropriation of the water as hereinbefore mentioned," and contend that that provision prohibits the sale of water beyond the carrying capacity of the canal system or in excess of the appropriation of water; also that excessive water rights have already been sold because of the loss in the canal system of thirty per cent by seepage and evaporation, and that the water users have a right to one-eightieth of a second-foot per acre, continuous flow, to be measured at a point within a half-mile of each 160 acre tract, and that on account of this loss in the canal each water user cannot receive a constant flow of one-eightieth of a second-foot per acre. That provision of the contract prohibits water rights or shares to be dedicated to any of the lands included within said project or sold for any lands beyond the carrying capacity of the ditch, and also in excess of the appropriation of said 3,000 second-feet of water. It prohibits

the sale of more than one-eightieth of a second-foot per acre
to any of said lands, and also prohibits the sale of any part
of said 3,000 second-feet of water for the irrigation of lands
outside of said project, as said contract clearly contemplates
that said appropriation of water shall be devoted exclusively
to the irrigation of lands within said project.  The conten-
tion that it is impossible to furnish each settler continuously
with one-eightieth of a second-foot for each acre is correct.
Said contract provides for a ditch capacity of one-eightieth
of a second-foot per acre and it also provides for a system
of rotation instead of a continuous flow, and it does not appear
that under a proper system of rotation there would be any
difficulty in delivering one-eightieth of a second-foot per acre,
or. amply sufficient water for the proper irrigation of such
land.

Counsel contends that rotation means trouble, expense and
annoyance, and ought not to be forced without necessity,
and that the rotation system is merely permissive, not obliga-
tory.  Under the provisions of paragraph 9 of said contract
the water to be delivered from the canal during each season
is required to be delivered in such quantities and "at such
times as the condition of the soil, crops and weather may
determine, but according to such rules and regulations based
upon a system of distribution of water to the irrigators in
turn and by rotation as will best protect and serve the inter-
ests of all the users of the water from this canal system."
Said provisions are obligatory.  A continuous flow is not obli-
gatory.  The Canal Company does not deny that under a
proper system of rotation there would be ample water to prop-
erly irrigate all of said land, but contend that each user is
entitled to a continuous flow.  There is nothing in that con-
tention.  Under the contract the interest of the settler is a pro-
portionate interest in the entire canal system and the water
appropriation.  If there is a loss, he must stand his propor-
tionate part.  Three thousand second-feet of water were ap-
propriated for 240,000 acres of land, or one-eightieth of a
second-foot per acre at the point of diversion.  The contract
required the canal to have in all of its parts a capacity of

one-eightieth of a second-foot per acre. The water was required to be delivered at a point within one-half mile of each 160 acre tract during the irrigating season; and the amount and manner of delivery was to be in such quantities and at such times as the condition of the soil, crops and weather may determine, and according to rules and regulations based upon a system of distribution in turn and by "rotation" such as would best protect and serve the interests of the users. The maximum amount of water provided for is one-eightieth of a second-foot per acre. The user's right to water up to the maximum of five-eighths of an inch per acre depends upon his actual necessity for the production of his crops, and the only method under the contract by which he could receive that amount would be by the rotation system.

It is suggested by counsel that the settler should be given substance under this contract and not shadow; water and not carrying capacity in the canal system. The settler is entitled to receive just what the contract entitles him to receive,—nothing more, nothing less. At the very outset, 3,000 second-feet of water, measured at the point of diversion, was appropriated for the irrigation of said 240,000 acres of land. If in the delivery of said water there is a loss of thirty per cent, the settler must bear his proportionate share of the loss, and if he insists on a continuous flow, he would only be entitled to seven-sixteenths of an inch per acre, as a loss of thirty per cent would reduce five-eighths of an inch to seven-sixteenths, save what is added by the collection of waste water under the coulee system. Under the rotation system, however, he no doubt would receive at least five-eighths of an inch per acre, and as we view it, could receive one inch per acre and would be able to irrigate his land in much less time with that amount than with five-eighths of an inch. While the rotation system may, as suggested by counsel for defendant, mean "trouble, expense and annoyance," it nevertheless has its advantages and increases the duty of water.

This court said in *Helphery v. Perrault,* 12 Ida. 451, 86 Pac. 417:

"Rotation in irrigation undoubtedly tends to conserve the waters of the state and to increase and enlarge their duty and service, and is, consequently, a practice that deserves encouragement in so far as it may be done within legal bounds."

The economical use of water in irrigation is of great importance to the state, and under the provisions of section 3293, Rev. Codes, the users of water are prohibited from using more than good husbandry requires for the crop or crops he cultivates. The duty of careful and economical use of water is one that by statute as well as public policy is imposed upon every water user, and under the various Carey Act projects in this state provisions have been made for the conservation and best use of the water supply and to make it perform as high a duty as possible, and if the rotation system more nearly accomplishes that purpose, it should be adopted.

In "Water Rights in Western States," by Wiel, p. 268, the author says:

"The practice of rotation is becoming more frequent, by which several appropriators pool their rights and use the whole for periods of time, and this often accomplishes a more economical use of the water." (See, also, Mills' Irrigation Manual, sec. 87.)

The use of water under the rotation system is approved by high engineering authorities. Buckley in his work entitled "The Irrigation Works of India," p. 282, says:

"The most wasteful system of irrigation possible is that under which all branch canals, distributaries, and village channels are in use continuously and the available supply is slowly dribbling into the fields. [This is the system insisted on by the defendant Canal Company.] For not only is the actual loss of water greater, but under this system there is also this further disadvantage, that the velocities in all the distributaries and minor channels are reduced and the silt in the water, which at these points of the system is nearly always advantageous to the fields, is largely deposited in the channels, and not carried on to the cultivated ground. The system of irrigation by rotation or by tatils, as it is called in Upper India, is of great advantage, not only in

checking the loss of water in the channel, but in teaching economical irrigation to the cultivators and in insuring an equitable division of the supply among the people.''

Sir Hanbury Brown, in his work on Irrigation, pp. 214, 216 and 217, says:

''When the supply of water is not in excess of the demand, an economical and just distribution depends more on correct methods of administration than on the perfection and completeness of the regulating works. All countries that have practiced irrigation on a large scale have found it necessary to adopt some system of 'rotation' whereby water is alternately supplied and withheld for fixed periods. . . . .

''The advantages of such a system are many. By concentrating the available supply in half or a third, or a less fraction of the canals, and giving the whole of it to the section whose turn it is to take water, the irrigation is made easy in consequence of the higher water levels produced in the canals. At the same time, in the other sections which are not receiving water, the danger of the canals causing waterlogging of the soil is removed and they are either empty or flowing at a low level. The crops require water at certain intervals, and not continuously. It is better for them, as soon as they have received a watering, that the water supply should be shut off from their neighborhood, so that all excess of water over and above that used up or absorbed, may be got rid of, and not be allowed to stagnate. Irrigation by rotation, moreover, is a system that conduces to economy of water. For the water is delivered just where and when it is wanted for irrigation, and is, therefore, not allowed to run to waste. The loss from evaporation and absorption is less, as the water is spread out over a less extent of canals.'' (See, also, Wilson's Irrigation Engineering, sec. 67.)

The rotation system is recognized by the leading writers on irrigation and irrigation engineering as a most efficient and desirable method and as producing the highest duty of water of any method in use.

Said contract provides for a ditch capacity sufficient to furnish to each land owner at least one-eightieth of a second-

foot of water for each acre of land. That amount of ditch
capacity may be utilized by adopting the rotation system,
but otherwise it could not be utilized, for after deducting
a loss of thirty per cent from the 3,000 second-feet appro-
priated, there would not be sufficient water to fill the canal
and its laterals to its full capacity at any considerable dis-
tance below its head; but by the rotation system, the full
capacity of the ditches may be used by those who are using
the laterals under said system. Said contract provides for
rotation in the use of water, and this court held in *Helphery
v. Perrault*, 12 Ida. 451, 86 Pac. 417, that where several parties
agree among themselves to unite in interest and jointly apply
as one applicant for water for irrigation purposes to use the
same in rotation, that such a contract was legal and would be
enforced by the courts although there was no statute pro-
viding for use by rotation. If each user cannot receive suffi-
cient water for the irrigation of his land by a constant flow
of his proportionate share of the water in said canal, but can
receive sufficient by rotation, that system should be used.

Recurring again to the rotation system, which is provided
for by said contract, and conceding that there is a loss of
thirty per cent by seepage and evaporation, and conceding
that the coulee system referred to does not increase the duty
of water, by the rotation system each land owner could re-
ceive more than his full quota of water more than half of
the time during the irrigating season. To illustrate: Con-
ceding that the loss is thirty per cent, there would remain
in said canal 2,100 second-feet of water available for distribu-
tion among the land owners which would be sufficient to
furnish each land owner ten days out of twenty with at least
one inch of water to the acre upon the lands on which crops
could be grown. However, be that as it may, it does not
appear from the record but that there is ample water for the
irrigation of every acre of said land; and even if there is
not, under the provisions of said contract, each land owner
owns a proportionate part of said irrigation system and said
water, and in times of shortage he is only entitled to receive
his proportionate share of the water. The water supply for

said system has been decided by the state authorities to be sufficient to amply irrigate all of the land within said project, and there is nothing in the record that contravenes that view. While it is made to appear that the settler cannot receive a constant flow of five-eighths of an inch of water or one-eightieth of a second-foot per acre, it is not made to appear that by a proper method of distributing the water in turn or by "rotation" that said 3,000 second-feet of water appropriated for said project is not amply sufficient to reclaim all of the land within said tract. And further, under said contract, the settler owns a proportionate share of said canal system and the water appropriated for the irrigation of the land within said project.

For the reasons above given, the writ of mandate prayed for must issue, directing the Canal Company to sell and transfer to the plaintiff the shares of water stock applied for, for the irrigation of the land purchased from the state, and to furnish him water therefor.

Costs of this proceeding are awarded to the plaintiffs.

Ailshie, Presiding Justice, concurs.

Petition for rehearing granted.

(March 15, 1912.)

ON REHEARING.

[121 Pac. 1051.]

AILSHIE, J.—On petition of defendant, the Twin Falls Canal Company, a rehearing was granted in order that the case might be argued to the court with a full bench. Counsel have filed exhaustive briefs and made oral arguments, and we have again given the matter very careful consideration, and are satisfied that the writ should issue. The order for the writ is made on the following grounds:

1. The contract for the construction of the irrigation works and system specially provided that a proportionate share of

the water appropriation of 3,000 second-feet was dedicated to sections 16 and 36 and such other lands as the state might own within the bounds of the segregation, and that the purchasers of such lands should be entitled to purchase a water right for ten dollars less per acre than would be charged to purchasers of government land.

2. The Twin Falls Canal Company was organized under and in conformity with the provisions of the contract between the state and the Twin Falls Land & Water Company, and is charged with the terms and conditions of that contract in so far as they provide for the sale of water rights.

3. The Twin Falls Canal Company having received and taken over the system and assumed the duty and obligation of operating the same and selling water rights cannot, in this proceeding, raise any question as to the failure of the construction company to comply with the contract in the manner of constructing the works and system or furnishing sufficient water to comply with its contract.

4. That where the Twin Falls Canal Company accepted and took over the canal system and undertook the operation thereof, it received the unsold shares of stock in the company amounting to 42,174.51, and agreed in writing "That the assignment and transfer by the second party of said 42,174.51 shares of stock as evidenced by said certificate No. 1319 in said Twin Falls Canal Co. is made by said second party and received by the first party with the understanding and agreement that the same shall be sold and disposed of and shall be subject to all of the terms and conditions set forth in that certain contract made and entered into between the said state of Idaho as first party and the said Twin Falls Land & Water Company as second party, bearing date Jan. 2, 1903, subject, however, to any amendments or modification of said contract as to the price of water rights under said system which have been heretofore made with the consent of the state board of land commissioners of the state of Idaho, or that may hereafter be so made, and provided that in no event shall said shares of stock be sold at a price less than $25 per share where the water right evidenced by the same is to be used

upon Carey Act lands, and at not less than $15.50 where the water right evidenced by the sale is to be used upon state lands,'' etc.

5. That the company is bound to employ the most economical method possible in the distribution of water from its canal and system, and if necessary adopt a system of rotation, and that it is not shown by the pleadings that under such a system of distribution there is not sufficient water to supply all consumers and furnish the plaintiff the amount demanded.

6. That the plaintiff West is a purchaser from the state of a portion of a section numbered sixteen, situated within the segregation covered by this irrigation system.

The writ will issue in accordance with the prayer of the complaint. No costs awarded.

Sullivan, J., concurs.

STEWART, C. J., dissenting.—I am unable to concur with the majority opinion in either the conclusion or the reasons upon which such conclusion is based. From a careful examination of the pleadings in this case and the entire record, I am satisfied that my associates have reached their conclusion upon a wrong theory of the pleadings, and by overlooking and disregarding the plain provisions of the contract. The general statement of the case as made by Justice Sullivan will be accepted, except in the particulars in which the statement of facts appears not to be in accord with the allegations of the pleadings.

The real controversy in this case is, whether a water right, purchased by a settler upon land under the contract between the Twin Falls Land & Water Company and the state, is entitled to receive water specified in such contract, at the point of diversion of the waters by the Twin Falls Land & Water Company from Snake river, or whether such water shall be delivered to the purchaser within one-half mile of the land where the same is to be used.

Justice Sullivan in his opinion holds, as I understand it, that a settler under a Carey Act reclamation project, when

he purchases· a water right, acquires the right to use upon
the land for which such water is to be applied, the propor-
tion of water diverted, in the ratio that the quantity diverted
bears to the aggregate acreage segregated, and it is particu-
larly his conclusion upon this point and the process of rea-
soning adopted in arriving at that conclusion to which I
cannot agree in this case.

A settler's right to the use of water under the irrigation
system of the Twin Falls Land & Water Company should be
determined in this case by the contract entered into between
the state of Idaho and the Twin Falls Land & Water Com-
pany on the 2d day of January, 1903, and the certificate of
sale of a water right under such contract, and it is upon this
contract and such certificate of sale of water right that I
am led to believe that my associates have misconstrued the
contract made between the state and the water company, and
have been forced to make a new contract which was not in-
tended by the parties.

In my opinion it is clearly provided by the act of Con-
gress known as the Carey Act, and likewise provided by the
statute of this state, that when a settler upon Carey Act land
purchases a water right from the company organized for the
purpose of providing water for the reclamation of such land,
that such water right must be sufficient in volume for the
complete irrigation and reclamation of the particular tract of
land for which such water is purchased. (28 St. at L., p.
422; 6 Fed. St. Anno. 397; Rev. Codes, sec. 1628.) And to
acquire title to such land, proof must be made of "reclama-
tion, settlement and occupation, which proof shall embrace
evidence that he is the owner of shares in the works which
entitle him to a water right for his entire tract of land suffi-
cient in volume for the complete irrigation and reclamation
thereof."

The contract made between the state of Idaho and the
Land & Water Company, paragraph 8, provides: "Said party
of the second part further agrees and undertakes that it will
sell or cause to be sold to the person or persons filing upon
any of the lands herein described or to the owner of other

lands not described herein, but susceptible of irrigation from said canal system, by good and sufficient contract of sale with right of possession and enjoyment by the purchaser pending its fulfillment, a water right or share in the said canal for each and every acre owned, filed upon or purchased from the state.

"Each of said shares or water rights shall represent a carrying capacity in said canal sufficient to deliver water at the rate of one-eightieth of one second-foot per acre and each share or water right sold or contracted as herein provided shall also represent a proportionate interest in the said canal, together with all rights and franchises based upon the number of shares finally sold in the said canal."

And it is further provided in said contract: "The certificate of sale of water rights and the certificates of shares of stock of the Twin Falls Canal Company, Limited, shall each upon being issued to the purchaser or holder of land under the canal system, be made to indicate and define in the contract or certificate as the case may be, the amount of water, to wit: One-eightieth of a second-foot allotted to each acre represented thereby, and a carrying capacity of the canal sufficient therefor, the water to be delivered from the canal during each and every irrigation season, said amount to be measured at or within one-half mile of the place of intended use." And also: "It is hereby agreed that every purchaser of shares in said canal or holder of stock in said Twin Falls Canal Company, Limited, shall be entitled to have delivered for the irrigation of his land, its full amount of water as herein provided." And that "in no case will water rights or shares be dedicated to any of the lands aforementioned or sold beyond the carrying capacity of the canal system, nor in excess of the appropriation of the water as hereinbefore mentioned."

These provisions of the contract clearly provide that the purchase of a water right will convey to the purchaser a proportionate interest in the entire canal system, and that such interest is a proportionate interest based upon the number of shares finally sold in said canal. But nowhere does the contract provide that the purchaser shall acquire a proportionate

interest in the water, but the contract does provide that the purchaser of a water right shall receive under such purchase a maximum amount of water *delivered within one-half mile of the place of intended use, to wit, one-eightieth second-foot per acre;* and the contract further provides that when water rights or shares of water shall be sold and dedicated to lands, to the extent of the carrying capacity of the canal, there can be no longer any further rights sold or disposed of. These various provisions of the contract indicate that the state board clearly had in mind the act of Congress granting Carey Act lands, and the provisions of the statute, and to secure a compliance with the law clearly fixed and determined in the contract the maximum amount of water necessarily required by the purchaser to reclaim such land, and such quantity of water as would enable the purchaser to make proof in accordance with the law; and also fixed a place where the water should be delivered for use upon the land and fixed a maximum quantity to be delivered at a point one-half mile from the place of intended use. The state land board in making this contract intended that there should be no reason to question the possibility of a purchaser of a water right being compelled to sustain the loss by seepage and evaporation that must necessarily follow the transportation of water from the point of diversion to the place of use, and to require a maximum amount to be delivered at or near the land to be applied and dedicated to the use and cultivation of such land in the reclamation thereof.

While it is true that sec. 3288 of the Rev. Codes is not a part of the statute which provides for reclaiming lands under the Carey Act project, yet I see no reason why the principle announced in this statute should not be applied to contracts to deliver a certain amount of water, made with the construction company under the statute authorizing contracts between the state and a construction company, under the Carey Act project. This statute provides: "Any person, association or corporation which may contract to deliver a certain quantity of water to any party or parties, shall deliver the same to such party or parties, together with a reasonable and neces-

sary allowance for loss by evaporation and seepage, at some convenient point on the main ditch, canal or reservoir of said person, association or corporation, or any branch or lateral thereof belonging to the owner or owners of such ditch, canal or reservoir.'' Whether this statute is a part of the law governing cases of the class involved in this suit, may be a doubtful question, yet in principle its provisions are reasonable, fair and just. Under this principle the company making the · contract to deliver water must deliver the same as contracted, and at the point stipulated in the contract, and it is incumbent upon the company to bear all shrinkage which may occur from the point of appropriation to the place of delivery for use. And in this case, under the contract the place of measurement is one-half mile from the lands of the purchaser, and the necessity or requirement of such amount for use upon the land can be determined only by proper proof, and cannot be determined, as stated in the majority opinion, as a matter of law. There is no question in my mind but that the state board intended, and that every purchaser who purchased a water right for the reclamation of land under the Twin Falls tract believed and perfectly understood, that a purchaser of a water right was entitled to receive the amount of water specified in the contract made between the board and the Twin Falls Land & Water Company, and that such water *should be delivered within one-half mile of his tract,* and that he was thereby assured that such quantity of water to the extent of his necessary needs would be so delivered to him, and it was the right he purchased.

This provision of the contract in my judgment, however, does not mean that a purchaser of a water right under a Carey Act project shall have or receive, or is entitled to receive, a constant flow of water, winter and summer, and all seasons of the year, and all days in the year and all hours in the day or night, but that he shall have what the contract specifies whenever he requires such water for a beneficial use. It must be recognized in this case, as in all water cases, that a party who has purchased a water right in any system of irrigation acquires the right only of using the water purchased, when

necessary for the use for which the same is purchased.   He cannot require the delivery of such water in order that it may run promiscuously and be wasted; he cannot demand it and compel its delivery simply because he makes the demand, if he has no use for it; and it was not intended by any consti- tutional provision, and it is not required by any provision of the statute, that a corporation or individual, who sells or rents water or contracts for the sale or rental of water, can be compelled to deliver water to one who has purchased the same, when there is no beneficial or necessary use to which the purchaser intends to apply such water.   The public waters of the state must necessarily be used for a beneficial use, and it is the duty of the courts in adjudicating water rights and the necessity for the use, to determine such rights according to the beneficial use made of such waters; and in considering the contract involved in this case I have dealt with it through- out this opinion with reference to the use made of such water under the purchase of shares of stock from the contracting company.   This use is clearly recognized by law and also by the contract involved in this case, by provisions relating to the rotation of water, as will be referred to later on in this opinion.

It is stated in the majority opinion that the Land & Water Company made a proposal for the construction of irrigation works, and that the south side canal should have a length of sixty-five miles, and that the capacity of the ditch was 3,000 second-feet, and accompanying such proposal was a water right location for 3,000 second-feet of the waters of Snake river, and that such proposal was referred to the state engineer under the statute, and that the state engineer reported that the area of the land to be irrigated on the south side of the river under the canal system involved in this case was about 240,000 acres, and that for the irrigation of this land a water right notice had been filed for 3,000 second-feet, and that the water supply would be sufficient to irrigate the lands during all seasons, and that upon such proposal and report 240,000 acres of land was segregated under the act of Con- gress, and that these reasons, together with the fact that some

18,000 acres of land within the project was state land, were the prime reasons why the state land board entered into the contract of January 2, 1903, and intended in so doing to provide that the 3,000 cubic feet of water appropriated from the Snake river by the Land & Water Company should be applied and used upon 240,000 acres of land segregated, and that such appropriation was sufficient in quantity to properly irrigate and reclaim the full 240,000 acres of land. While the above facts are correct, the conclusion therefrom reached in the opinion does not follow, and an examination of the allegations of the pleadings in this case does not support this contention, but, on the contrary, shows that such was never intended by the state engineer or the state board. The report of the engineer, neither in the language used nor by implication, states the quantity of water required to irrigate each acre of the proposed tract, or the quantity of water per acre that will be provided by the appropriation or the system of works to be constructed. It would be conceding to the engineer a knowledge which is inconceivable, and if his statement is his opinion, it is mere guesswork, and would be purely imagination, for the reason that it would be an impossibility for the state engineer to determine such matter by casual observation of a territory covering 240,000 acres, within the time spent by the engineer in this case in his examination. A judicial determination of the right of a settler in the use and appropriation of water under a reclamation project should not be determined upon such uncertain and indefinite statements, and the settler ought to have some opportunity to show the necessity of the right to use water, under the laws of the United States and the laws of the state.

Under the statute prescribing the duties of the state engineer with reference to the report, the report of the engineer is merely preliminary to the action of the board, and in no way binds or controls the state board. The system reported upon by the state engineer may be altered or changed by the board, and the board may not accept the report of the engineer and may make a contract upon its own judgment, and the contract itself shows the intent and purpose of the board,

and under the statute is the only act on the part of either
the engineer or state land board which in any way binds the
contracting parties. So it seems that the report of the state
engineer is no part of the contract, and notwithstanding what
the state engineer may say, the state board still has the power
to act upon its own judgment and make a final contract be-
tween the state and the contracting company. And if this be
true, the report of the state engineer should in no way control
or govern the rights of the purchaser of water rights made
by settlers upon land under the contract made between the
state and the contracting party. And I do not believe that
the majority opinion is justified in saying that the report of
the state engineer in any way controlled the state board in
fixing and determining the rights of the purchaser of water
used under such system, but that such rights do emanate from
the contract alone and not from the engineer's report.

The statement of Justice Sullivan as to matters considered
by the engineer in designating the irrigation district refutes
the correctness of the premises assumed to be true in the
opinion. He says: "The engineer in designating said irriga-
tion system must have taken into consideration the condition
of the soil and climate, the amount of water necessary for the
proper irrigation of all of said land included within said
project required to be irrigated, and also the fact that there
would be many thousands of acres in said project required
for roads, highways, railroads, barnyards, stackyards, build-
ings, high points and rocky untillable land, land along fences
and other lands on which crops are not raised, which it is
estimated would total about 25,000 acres. These facts were
no doubt considered, as well as the probable loss from evap-
oration, seepage, etc., in conducting the water to the place of
intended use."

The above statement of Justice Sullivan is true, and a fact
known to every common-sense person who is acquainted with
the topography of the country and the conditions that must
necessarily be taken into consideration in determining the
acreage that can properly be irrigated with 3,000 second-feet
of water appropriated at a given point and to be transmitted

to and applied upon such acreage. But the facts as thus stated show very clearly that the state engineer did not determine and the state land board did not determine that 3,000 second-feet of water at the point of diversion was sufficient to irrigate 240,000 acres of land. It is nowhere stated, either in the report of the engineer or in the contract made between the Land & Water Company and the state board, that 3,000 second-feet of water at the point of diversion will furnish sufficient water to properly irrigate exactly 240,000 acres of land, and because of the fact that there was a large body of land within the segregation that was not susceptible of irrigation, it was the opinion of the state engineer, and likewise the opinion of the board as indicated by the contract they made, that 3,000 second-feet of water would be sufficient to irrigate the lands which *were susceptible of irrigation within the segregation,* by giving to each purchaser of a water right one-eightieth of a cubic foot of water at a point one-half mile from the land of the purchaser of the water right, and as a result of such opinion the board wrote into the contract now under consideration the provision: *"That water conducted through the same may be delivered at a point not exceeding one-half mile from any legal subdivision of one hundred and sixty acres of land herein described, filed upon, owned or occupied as aforesaid and to be irrigated or reclaimed by the water conducted through said canals and main laterals."*

The act of Congress provides that a state upon accepting the provisions of the act shall reclaim the lands within the segregation susceptible of irrigation, and in making the contract in this case between the state and the Land & Water Company, it was intended by the board to require the Land & Water Company to make an appropriation and construct a system which would furnish water sufficient in volume for the complete irrigation and reclamation of the lands susceptible of irrigation within the segregation, as required by the law of this state, sec. 1628, Rev. Codes, and that the contract should require the Land & Water Company to convey a quantity of water sufficient in volume to completely irrigate and reclaim

the land for which the same is to be used, and that the board did not intend in making such contract to encumber such water right with the responsibilities and uncertainties which would result from loss from seepage and evaporation, but that the purchaser of such right would have a fixed maximum quantity of water to apply to the use required by law.

If it be true that this was the purpose of the law and the intention of the board in making the contract, then it must follow that the extent of the right of a water purchaser under the Twin Falls tract cannot be determined as a matter of law, but must be determined upon the facts as shown by proper proof, and that this court is not justified in saying that one-eightieth of a cubic foot of water at the point of diversion is sufficient in quantity to properly irrigate and reclaim each acre under the Twin Falls tract. It is provided by the contract of January 2, 1903, between the state and the Land & Water Company, that the system shall cover not only the Carey Act lands embraced within the segregation, but also state lands, to the extent of the appropriation and the capacity of the canal, and I am clear that there can be no question but that the state may make such a contract and include the state lands with Carey Act lands, but that in so doing the state lands take the same status as those granted to the state under the Carey Act, and that the water applied to state lands becomes appurtenant to such lands by the same method and manner as the water becomes appurtenant to the lands reclaimed under the Carey Act. The contract provides: "To the person or persons purchasing any portion of sections numbered sixteen and thirty-six, or any other lands belonging to the state of Idaho which are susceptible of irrigation and reclamation from this canal and to which such water rights are to be applied and dedicated at a price not exceeding fifteen and 50/100 ($15.50) dollars per share," etc.

It thus clearly appears that the sale or water contract constitutes the dedication of the water to the land, and therefore the water becomes dedicated when the contract of sale of the water right is made, whether the right be purchased for Carey Act land or state land. And the contract also provides, after

enumerating the prices of such water rights, wherein the price of water rights for state lands is specifically fixed, and says: ''But in no case will water rights or shares be dedicated to any of the lands aforementioned or sold beyond the carrying capacity of the canal system, nor in excess of the appropriation of the water as hereinbefore mentioned.'' This contract clearly specifies that whenever water rights shall be sold and dedicated to lands, whether they be Carey Act lands or state lands, to the extent of the carrying capacity of the canal system, there can be no further dedication or sale of water rights to any lands of any kind, whether state or Carey Act lands.

I think it clearly appears from the pleadings in this case that it was not the intention of the construction company or of the state land board that the construction company should construct a system which should irrigate all of the 240,000 acres included within the exterior boundaries of the segregation, or any definite amount of land, but that the appropriation should be made and a system constructed which would sufficiently irrigate the lands within the segregation susceptible of irrigation, whether Carey Act lands or state lands; and that water rights should be sold represented by shares of stock which would be adequate and sufficient for such irrigation to the extent of the capacity of the system, and that whenever sales of shares of stock equal to the carrying capacity of the system have been made, then further sales of water rights are prohibited, and could not be sold or the water dedicated to any lands beyond the carrying capacity of such system. The extent of the water purchased under such water rights cannot be lessened or affected by the fact that there is yet a portion of the 240,000 acres included within the exterior boundaries of the segregation that can be irrigated, or by the fact that other land within such boundaries is susceptible of irrigation, if the capacity of the system has been exhausted at the time application is made for water for such lands. The contract in this case having expressly provided that each water user should have delivered to him one-eightieth second-foot per acre within one-half mile of his land, if the

company constructs a system, and such system has the capacity to deliver only a one-eightieth second-foot of water to a less acreage than is described in the segregation, I am unable to find any authority under the contract or the statute which will authorize the company to issue stock in excess of the capacity of the system, as both the contract and the statute prohibit the sale of shares beyond the capacity of the system. The carrying capacity of the system not only means the capacity of appropriation, but also the capacity to deliver the water in accordance with the contract; and whenever water rights have been sold and dedicated to lands up to the extent of the carrying capacity of the system, then both the contract and the statute prohibit the sale of any further water rights.

In this case it is shown by the answer that the carrying capacity of the system to deliver water as provided in the contract has been more than reached by the sales of shares of stock and water rights, and that being true, I do not think that this court should direct the sale of additional shares of stock without giving to the settlers the right or opportunity of presenting proof showing the facts as to the carrying capacity of this system and the sales of water rights made.

The legal duty of the defendant in this case is to be measured and limited by the quantity of water which the capacity of its system will deliver. When this supply is exhausted by furnishing water to those who have a legal right to the use of such water from such system, the legal duty to all others demanding water has ceased; and it is incumbent upon the plaintiff in this case to show not only that the defendant company has sufficient water to supply the demand made, but that such quantity is over and above the amount of water legally required and supplied to other purchasers and users of water under said system who have acquired rights. The legal duty then imposed upon the defendant company to sell shares of stock to West which will entitle him to the use of water upon the lands purchased by West from the state extends only to the surplus water which remains, and is in excess of that previously sold, and the needs of others actually re-

ceiving water and entitled to water by reason of purchase and use in accordance with the contract made between the state and the Land & Water Company constructing said system; and if there is no surplus, the writ of mandate cannot be resorted to.

Referring again to the pleadings, it is alleged in the complaint that at the time of turning over the canal system constructed by the Twin Falls Land & Water Company to the Twin Falls Canal Co., the defendant herein, there remained unsold 42,174.51 shares of stock, and that such stock represented a maximum water right of one-eightieth of a cubic foot per second for each acre of land remaining unsold; and that there was unsold Carey Act land, and also unsold state land within the project, and that the plaintiff has purchased certain state lands and has applied to the defendant canal company for the purchase of unsold stock sufficient to irrigate such land purchased from the state. The answer admits that there were 42,174.51 shares of stock turned over to the Twin Falls Canal Company, and admits that if such shares were sold, each share would represent a water right of one-eightieth of a cubic foot per second for the land to be irrigated thereby, provided there was available water therefor, and denies that the said shares of stock so unsold represent a maximum water right of one-eightieth of a cubic foot per second per acre of land remaining unsold of Carey Act or state land provided for in the contract, or represented a right of any amount to or for any lands whatever, available for said unsold stock; and alleges that there has been and is no water available to supply land which such stock would represent; and alleges that there has been sold by the Twin Falls Land & Water Company 198,721.74 shares of water rights in said system, and the same number of shares of stock in the defendant corporation, and that every share or water right so sold represents the right to receive and have delivered within one-half mile of the place of intended use one-eightieth of a second-foot of water. That by reason of the foregoing all of the water rights in said canal system have been sold, and there now remains no water or water rights in the said canal system

which can be sold by either of said defendants; and that there is no water or water rights available under and by virtue of the said appropriation or otherwise or at all; and for such reason the defendant cannot sell or dispose of said stock until such a time as by means of other methods available water can be increased, and that said canal system and irrigation works do not have a carrying capacity sufficient to deliver simultaneously or by rotation one second-foot of water to each eighty acres of land to the extent of 240,000 acres of land, or to any amount in excess of the amount of acres now sold and filed upon and entitled to water from the defendant company.

In the face of this denial the majority opinion holds that this denial presents no issue whatever, and that the defendant is not entitled to a hearing thereon, and the opinion holds that there is surplus water unsold, and that stock representing shares of water may be sold, and directs that additional water rights be sold to the plaintiff for the lands by him purchased. If a writ can be issued in this case, then it is compulsory on the part of the respondent company to sell the additional 42,174.51 shares of stock for additional lands, notwithstanding the fact that the defendant company, which is directed to issue such stock, alleges in its answer that the full capacity of the irrigation system has been exhausted, and that the water sold is required and necessary for the use for which it was sold. This allegation shows a state of facts which in my judgment prohibits the respondent company, both under the statute and the contract, from selling any additional water rights, for it is provided in the contract: "That in no case shall water rights or shares be dedicated to any of the lands aforementioned or sold beyond the carrying capacity of the canal system, nor in excess of the appropriation of the water as hereinbefore mentioned." If this provision in the contract does not prohibit the sale of water rights beyond the carrying capacity of the canal system, I am unable to comprehend the English language, and the answer having positively alleged that to sell additional water rights will require the use of water in excess of the appropriation made, and the carrying capacity

of the canal, such issue so presented by the answer in my judgment requires proof upon the part of the plaintiff in order to justify the issuance of a writ of mandate. (*State v. Washington Irr. Co.*, 41 Wash. 283, 111 Am. St. 1019, 83 Pac. 308; *Florida Central R. R. Co. v. State*, 31 Fla. 482, 34 Am. St. 30, 13 So. 103, 20 L. R. A. 419; *Perrine v. San Jacinto W. Co.*, 4 Cal. App. 376, 88 Pac. 293; *Cozzens v. Ditch Co.*, 2 Cal. App. 404, 84 Pac. 342.)

The majority opinion overlooks the real test as to when a writ of mandate should be issued. The plaintiff in this case when he entered into the contract with the state to purchase state lands, by the mere fact of making such contract, acquired no rights to the use of water from the canal system involved in this case. Water had not been sold, rented or distributed to the plaintiff or to the lands which he purchased, and water had never been dedicated to such land, and the plaintiff has in no way acquired any water rights, and has no legal right to demand water from the defendant company, unless such company has water which has not been previously sold. In my opinion, where there is no legal duty requiring that water rights shall be sold in excess of the carrying capacity of the canal system supplying such water, a writ of mandate cannot be enforced to compel such action. (Rev. Codes, sec. 4977.) And especially is this true where the answer positively alleges that there is no unsold water capable of being delivered, and that the carrying capacity of the canal system has been exhausted by the sale of water rights prior to the demand to purchase by plaintiff.

There is some discussion in the briefs of counsel for the parties in this case with reference to the rotation of the water when there is a shortage, and the majority opinion discusses this question to some extent, but in my opinion this question is not involved in this case, notwithstanding the fact that both under the statute and the contract in this case rotation may be required and exacted of users of water when there is a shortage in the supply or service of the water, under water rights purchased in a Carey Act project. But this does not mean a shortage resulting from sales of water rights in excess

of the capacity of the system.   The rotation referred to in
the contract and recognized by the statute is a shortage re-
sulting from want of supply or inability to deliver the supply
because of some incapacity of the system, such as breakage
in the ditch, or something of that kind, and not a shortage
arising from use under sales in excess of the capacity of the
system, and this question might arise upon a hearing in this
case, provided the plaintiff is able to show that the capacity
of the system will not be exceeded by requiring a sale of
shares of stock to him for the purpose of watering the lands
which he has purchased from the state.

For the reasons stated in this opinion I am clear that the
respondent in this case should have a hearing upon the facts
and issues presented by the answer, and that a writ of man-
date should not issue except on the determination of the facts
after hearing.