**TWIN FALLS LAND & WATER CO. v. TWIN FALLS CANAL CO.**

No. 1598.

District Court, D. Idaho.

Aug. 18, 1933.

James R. Bothwell, of Twin Falls, Idaho, and Edwin Snow, of Boise, Idaho, for defendant.

Bissell & Bird, of Gooding, Idaho, for plaintiff.

JAMES ALGER FEE, District Judge (after stating the facts as above).

In order to clearly set out the issues, a preliminary inquiry into the public policy governing water rights in the state of Idaho and its effect upon the two corporations involved and the shares which constitute the subject-matter of the contract must be made.

It is trite to observe that water is the life-blood of the arid portion of the western states. So essential is it to existence that it is administered as a public trust. Constitutional and statutory provisions are set as wardens to guard the supply. Waste is criminal. On the other hand, beneficial use of water is the foundation of the prosperity of these arid states.

The state of Idaho in its sovereign capacity was interested in the development of prosperous communities upon desert lands within its boundaries. It has adopted a code, intricate in detail and various in ramifications to protect that resource. Pursuant to this policy and with the beneficent purpose of utilizing this resource upon the "Great American Desert," the legislation, state and national, heretofore adverted to, was enacted. This design of building an empire led to the investure of plaintiff with a public function and to the creation of the defendant. Since the state was authorized by the Carey Act to construct such projects either itself or through a construction company, it availed itself of the opportunity offered by plaintiff and chose the latter as the instrumentality to perform the public function of reclaiming these arid lands for the future prosperity of the commonwealth as a whole, but the state did not depart thereby from the principle that the waters within its boundaries were a public trust to be used for the common good.

The plaintiff is a purely private corporation organized for the purpose of gain. In order to compensate plaintiff, therefore, for the construction of the project the state gave it a power to sell shares up to the amount of water appropriated and a first lien upon each parcel of land reclaimed and the water right appurtenant thereto, to secure any deferred payments. There was no intention that the construction company should be the owner of the dam or works. Nor did it become the owner of any water right.

It is an unescapable feature of the contract between the state and plaintiff then that the latter accepted the public trust of administering a certain portion of the waters of the Snake upon the Twin Falls South Side project under the terms of that agreement and for the benefit of future users of these water rights and the public at large. In this respect, although not a municipal corporation, plaintiff was tinged with the public interest.

246

The same public policy governs the defendant. It was organized under the terms of the contract between the state and plaintiff for the purpose of operating the canal and equitably distributing the waters appropriated, and of holding the dam and canals for their benefit. It is a quasi municipal corporation erected with the distinct design of carrying on a public trust. "The canal corporation is not one organized for profit, but is one organized really for the purpose of performing a public duty." State v. Twin Falls Canal Co., 21 Idaho, 410, 121 P. 1039, 1042, L. R. A. 1916F, 236.

This résumé of the character and functions of the two corporations shows each acted in a public capacity in carrying out the purpose of the state. In its private character plaintiff had a vital pecuniary interest in the construction of the project.

Under the contract between the state and the plaintiff the state land board fixed the price per acre to be charged to the settler for a water right. The Carey Act authorized a limited lien upon the land, up to the actual cost of construction plus interest, and the statutes of the state permitted such a right against the land pursuant to that authorization, and extended a lien broader in scope upon the water rights in favor of plaintiff for any unpaid balance upon any shares which had been sold and that was the sole pecuniary right which it had therein. See Idaho Irr. Co. v. Pew, 26 Idaho, 272, 141 P. 1099. "The construction company's interest in the reservoirs, dams, water rights, etc., is represented by the lien provided by law to cover the cost of construction." Idaho Irr. Co. v. Lincoln County, 28 Idaho, 98, 152 P. 1058, 1061. When all deferred payments have been made and all available water rights under the appropriation have been sold, the construction company is presumed to be paid in full.

Even though later it was the policy of the state to fix "a sum which shall represent such actual cost of construction" only as full compensation for a construction company, Idaho Irr. Co. v. Lincoln County, 28 Idaho, 98, 107, 152 P. 1058, 1061, the state could not interfere with the sale of surplus shares when it was found that on this pioneer project the plaintiff would actually receive some $2,500,000 above the estimated cost. In order to carry out its sovereign function as guardian of the rights of future settlers on its domain, however, the state had imposed one significant limitation upon plaintiff. The contract bound plaintiff never to sell any shares "in excess of the appropriation of water."

It must be recognized then that plaintiff was exercising a public function in the sale of shares but that in its private capacity it had the right to receive the proceeds from the sale of certain shares of stock and had been granted the power to sell these shares up to a definite number circumscribed by the inherent limitation established by the state contract.

Under all the surrounding circumstances, it is a plausible view that a share itself was not a property right until sold, and not at that point unless there were surplus waters in the appropriation to which it could attach.

The Twin Falls Canal Company was, under the state contract, to be organized to provide "a convenient method of transferring the ownership and control of said canal," and it was further provided that plaintiff should subscribe for all the stock in defendant and should transfer to the owner or person filing on or purchasing lands susceptible of irrigation from this appropriation one share "for each and every acre owned, filed upon or purchased from the state," and should transfer the dam, irrigation system, and works to defendant. Furthermore, plaintiff specifically contracted that each share should represent one-eightieth of one second foot of water per acre. It was contemplated that the full number of shares might never be sold, for the contract provides that each share shall "represent a proportionate interest in the said canal, together with all rights and franchises based upon the number of shares finally sold in said canals." Each share was then to represent a water right plus a proportionate interest in the property which plaintiff was to hold in trust for defendant until the project was transferred to the latter. But a water right can only exist when appropriated for and appurtenant to land upon which a beneficial use of the flow can be made. They were, when issued, only indicia of a water right dedicated to a definite parcel of land. If sold and appurtenant to land, each share constitutes a proportionate interest in the works and the water. Unsold, a share is of potential value only under peculiar conditions. It cannot be placed on the market like industrial stock and sold to the public at large. The purchaser must be in a position to apply the water represented to a specific tract of land, subject to irrigation from the original appropriation. The most potent factor is that when all the water appropriated has been applied to a beneficial use, a share of stock has no value, actual or potential, except for nuisance purposes.

It is perfectly clear then that the plaintiff had no absolute right in the dam, system of canals, irrigation works, nor the water rights connected therewith, even though it temporarily held legal title thereto. It held this property subject to a public use, and in trust for the state and the prospective owners. It recognized its fiduciary capacity by the transfer of the dam, canals, and irrigation works to defendant. But it had no higher right as to the shares remaining unsold. It had only a power to sell those shares to, but not in excess of the appropriation. If the unsold shares constituted property at all, plaintiff held the legal title to them in a fiduciary capacity and subject to the public interest. Its present claim of an absolute proprietary right is a contradiction and repudiation of all its obligations. The state court has held that a construction company had no proprietary right in a system but took the property as a fiduciary. "Under no reasonable construction of such law can it be held that the construction company is the owner of either the water right or the system, but is only given the right to sell them for the purpose of reimbursing it for the cost of construction." Idaho Irr. Co. v. Lincoln County, 28 Idaho, 98, 107, 152 P. 1058, 1061. The federal court should be bound by this view. In other words, the plaintiff itself held these shares, as it had held the dams, canals, and water right, in trust for the state of Idaho and for the purchasers of units of the system in the future. There can be no doubt of its fiduciary capacity. It could, at suit of the state on relation of a prospective purchaser be compelled by mandate to sell water rights up to the beneficial capacity of the system. See State v. Twin Falls Canal Co., 21 Idaho, 410, 121 P. 1039, 1042, L. R. A. 1916F, 236, where it is said: "This action is in effect to compel the performance of a public duty. The canal corporation was organized under the supervision of the state for the purpose of carrying out a certain duty resulting from a trust. * * *" It could have been forced to cease selling further water rights when no available surplus existed in the system. " * * * In view of the fact, shown by the record and which is here undisputed, that the construction company has already sold water rights far beyond the available supply of water, we are also of opinion that the court below was entirely right in enjoining it from making any further sales." Twin Falls Salmon River L. & W. Co. v. Caldwell (C. C. A.) 242 F. 177, 191. It could have been required to cancel water rights sold after the existing appropriation had been exhausted if all the shareholders were parties to the suit.

"If, therefore, the supply of water is not adequate for the reclamation of the acreage for which water-right contracts are outstanding, and yet is adequate for the reclamation of a smaller acreage, * * * it is evident that some of the contracts must be eliminated before any of the lands can be said to be reclaimed, or be adjudged subject to such a lien. Of course, an ascertainment or designation of the contracts which must fall and those which are to stand cannot be had in a suit to which their holders are not parties.

"The same thing is true as respects the elimination of contracts made in contravention of the provision in the contract between the state and the company that water rights should not be sold in excess of the available water supply." Com. Trust Co. v. Smith, 266 U. S. 152, 160, 45 S. Ct. 26, 29, 69 L. Ed. 219.

Whether a strict trust relationship can be worked out between plaintiff and the state and the purchasers of water right or not, it is clear, on account of the public interest, the construction company was subject to control upon equitable principles and that its business was touched with public interest.

The only really valuable things belonging to the plaintiff before the contract in suit was executed was the right to proceeds of stock which was sold and the right to determine how much stock could be sold before the appropriation was exhausted. It was thus confronted with a situation where, on one side was ranged the public policy which required the widest beneficial use of every available drop of water, coupled with its own interest to obtain the full measure of profit, and on the other side the public policy which required settlers to have sufficient water to build a prosperous community, together with the plaintiff's own contractual obligation not to sell water rights beyond the capacity of the canal. It was obvious that after lands and water rights had been sold by defendant to settlers and a shortage of water occurred that strife would be occasioned by an attempt to dispose of further water rights. The inevitable happened, and the contract of 1910 was an attempt to compose this struggle.

When the transactions last referred to are viewed, it is patent that the purpose of plaintiff, the qualified acceptance of defendant, and the written contract of December 31, 1910, must be read and construed together, for otherwise the complete structure is not

disclosed. It must be further noted that plaintiff throughout the transaction was insisting upon the sale by defendant of 5,000 shares of stock. As to these particular water rights a serious legal problem existed in that the lands to be served did not lie "under" the canal as required by the state contract but could only be reached by pumping.

The proposal made by plaintiff sets out that a difference exists between plaintiff and defendant as to the number of shares of stock in the canal company "which should be rightfully issued, if any to represent water and water rights in said system remaining at the present time undisposed of." Plaintiff then advanced the matters in which it was chiefly interested. It proposed that 5,000 shares be sold for the pumping project and that certificates be issued for water rights which had previously been sold for state lands. This was unquestionably all plaintiff was contending for at the time. These items would undoubtedly represent a great concession upon the part of defendant. The plaintiff was, therefore, under obligation to offer something substantial for this surrender. It obviously was of importance for the defendant to control the remaining shares of stock to prevent the project from oversale, so it is that plaintiff offered as a consideration to convey these shares which stood in its name, in trust, together with the power of sale vested in plaintiff, and beyond this a right upon the part of defendant to receive one-half the proceeds of such sales, if any.

It is most significant, however, that although defendant accepted the proposal in all other respects and made the sales of upwards of 5,000 shares desired by plaintiff, it rejected the words of trust as applied to the remaining shares of stock themselves and accepted such trust for the plaintiff only as applied to the proceeds in the event any were sold. This was entirely accurate construction of plaintiff's rights under the state contract. Any funds arising from the sale of such stock were the property of the plaintiff except in so far as it had given an interest to defendant, and it was appropriate to create a trust for it when any shares were sold and the moneys paid. Inasmuch as both these companies, as far as the distribution of water and the sale of these shares were concerned, acted in a public capacity and subject to the limitations of the state contract, the transfer of the shares accomplished little more than a change of fiduciaries. The public interest was paramount. Both companies were charged with the same duty. It was incumbent upon each successively, to the end that there would be no waste, to see that every share which the water appropriated would accommodate in beneficial use, was sold, and on the other hand, in order to prevent failure of the project as a whole, to see that no water right in excess of the reasonable duty of water be sold.

If the contract and the proposal be taken by the four corners, each seems to indicate that the plaintiff at that time believed that there was no water available for the sales of more stock. In its proposal plaintiff twice uses the words "if any" as qualifying surplus water rights. The contract itself also contains this expression in the same connection. But far more conclusive is the language whereby the power of sale was conferred upon defendant, both in the contract and the proposal. Each document contains the clause "If the Twin Falls Canal Company shall hereafter conclude that there remains in said canal system water rights in excess of the number of shares of stock in said corporation already issued (and not otherwise) * * * then it * * * shall endeavor to sell said shares of stock." This is clearly a condition contrary to the fact. It is doubtful if stronger expression to vest absolute power of determination in defendant could have been found.

Thus defendant accepted the responsibility of the shares of stock with the provision that it should dispose of them if excess, and should hold them if all available water rights were being used. But the trust ran to the state and the owners of an interest in the water supply. Defendant had a selfish interest that its shareholders should not be deprived of water available to apply to a beneficial use up to one foot to each 80 acres. Plaintiff had a selfish interest in that it desired as much stock sold as possible. Defendant purchased from plaintiff, therefore, the right, as far as the latter was concerned, to determine whether there were surplus shares in the system and bound itself to sell any such surplus. Defendant contends its determination not to sell further shares was, as to plaintiff, final. Plaintiff on the other hand claims that by a failure to sell the remaining shares, defendant acted in bad faith and contrary to the facts, and that the contract should be canceled and the stock turned over to plaintiff for sale.

Whatever the relation between plaintiff and defendant was as a result of the contract, whether a trust was created for plain-

tiff or not, it is clear that the highest obligation to the construction company incumbent upon defendant was to exercise good faith in any determination it might be called upon to make. The court therefore, over objection of defendant, admitted and considered evidence submitted by the plaintiff in an attempt to prove bad faith on the part of the operating company.

The record establishes that defendant has never concluded that there were surplus water rights existing in the appropriation, but has steadfastly maintained the contrary. It did not, therefore, violate the letter of the contract by failing to sell additional stock. Plaintiff notwithstanding this fact contends that defendant violated the principles of fair dealing and good faith in two important particulars. First, it is said that defendant is entitled to a supply of water from the Snake river under the appropriation beyond that which it is presently receiving, and that, to the knowledge of the company, the water users are deprived thereof by the method of administration followed upon the river. Plaintiff also contends that the settlers upon the Twin Falls tract are wastefully applying water upon the lands to defendant's knowledge. Its argument is that the supply of water, if not so improperly diminished, would, if applied only in quantities required for beneficial use, irrigate all the present lands under the canal and leave surplus shares to be sold for other lands.

Upon the first point, voluminous testimony has been taken to show how the Snake river is administered. The attempt was made to prove that the method of distribution and credit has been so erroneous and unlawful that the acquiescence of defendant therein was fraudulent as respects plaintiff.

The method of present administration may be summarized. A watermaster is elected under general law, by the water users in the District, including the river and canal systems from Cloughs to Milner Dam, together with the Twin Falls project, for the purpose of administering the water. The same individual is regularly designated Deputy Commissioner of Reclamation for this District. In the interest of harmony, a committee of nine, chosen by the water users, consult with the watermaster and defendant has regularly a representative upon this body. In the spring the watermaster determines from all available sources, what type of year as to water flow is about to ensue, and by comparison with records of past years before conditions were changed by irrigation and by storage in the river, and through elaborate compilations of the two elements under these changed conditions sets an appropriate figure for natural flow for the season.. The amount of storage and natural flow in the stream is figured by a complicated system which need not be gone into here. The committee of nine apparently approve the result and agree to abide by it. The distribution is made accordingly for the current year.

The chief criticisms by plaintiff are that the flow is estimated in advance and that the results are agreed upon by a committee of nine appointed by the various water users; that the watermaster is elected and therefore his determinations have a political cast; that he does not follow the statutes with reference to the transmission of stored water; and that there is much more natural flow than is accounted for by him.

In some of these criticisms, if logic or the statutes of Idaho were the sole guide, merit might be found, but no analysis of the administration of the river could be exact without an investigation of the historical developments and of the legal foundation upon which this method rests. When the plaintiff turned over the system to defendant in 1909, insufficiency of supply had developed on certain other projects, and in the short water year of 1910 trouble was experienced upon the Twin Falls tract itself. Immediately steps were taken by defendant to make certain of the limits of supply.

In the state courts of Idaho, the canal company instituted a suit to have determined the priorities of water rights on the Snake river which was entitled "Twin Falls Canal Co. vs. Charles N. Foster, et al.," and which terminated in what is commonly called the "Foster Decree." By this decree the canal company was awarded three thousand second feet of the natural flow diverted at Milner Dam, and other natural and storage rights of various priority were decreed. The significant portion of the decree for present purposes is the following paragraph:

"It is Further Ordered, Adjudged and Decreed until otherwise provided by statute, the State Engineer of the State of Idaho, or his duly authorized deputy, shall determine what part of the water flowing in Snake River at the Minidoka and Milner Dams is storage waters, and what part is natural flow, as provided by the Idaho Session Laws of 1909, p. 150 entitled 'An Act to provide for the safeguarding of the Rights of those Conserving Public Waters in Reservoirs and prohibiting Misappropriation of such waters by those

having no Right to the Use of the Same and declaring a Misdemeanor' (now § 41-701 Idaho Code, 1932) the amount of the natural flow to be determined as such natural flow would be, if unaffected by the diversions or acts of the parties hereto or any or either of them by the release of stored water, the natural flow to which the Twin Falls Projects are entitled to be measured to them at the Milner Dam."

The river was operated under the direct supervision of the court for two years before the entry of the decree and since that time, for twenty years, the method of administration has been the same. The Deputy State Engineer, now Deputy Commissioner of Reclamation (S. L. Idaho 1919, c. 8, § 37) who, as above noted is the watermaster, has each year determined what part of the water flowing in the Snake at Milner Dam is storage water. He has, under the decree, estimated the probable flow of the Snake and attempted, by comparison of the record of years calculated to correspond with the current year, to set a reasonable figure for the natural flow in that season, if it were unaffected by the tremendous changes which have taken place in the bed of the stream, in the amount of water applied to upper lands, in the secretion of subsurface water, and in the escape of storage waters. This administration has been acquiesced in by all the parties and was binding upon defendant unless the state court could be induced to modify its decree. When the whole story has been told by both sides, it is clearly a question of expert opinion dealing with an unknown. If honestly made, the opinions of the Deputy Commissioner were of as much avail as those of the hired experts of the plaintiff who admittedly set out to prove him wrong.

Most of the criticisms of the administration of the river may be classed under two main heads, first that too much credit is given to storage, and that the natural flow is greater now than it was formerly. But these facts are inherent in the terms of the "Foster Decree." If the canal company is only entitled to that portion of a three thousand second foot right which would have been furnished by the river in its natural state, then the company should be satisfied if it receive an amount coresponding to the quantity which it got in an analogous year. Likewise the new natural flow caused by the loss of storage water in the river above cannot be credited to it.

As far as determining the present natural flow of the river is concerned, the complications of the problem are very great. The Deputy Commissioner uses a method which is subject to criticism and which at best is empirical and results in a general approximation. It may even be that a more scientific method of approach is suggested in the testimony. But in any event his determination is based upon various measurements of the river by distinguished and disinterested observers, together with the computations and formulas based thereon. The Newell formula, which is one of those above referred to, is criticized because it is based upon observations in three different years, two of which were short water years. However, none of these conditions were complicated by storage water for it was just beginning to creep up in American Lake Reservoir. The whole basis of plaintiff's attack upon the administration of the Snake, on the other hand, is an investigation made by three engineers in 1931, notoriously a short water year, of the springs in the bottom of American Lake Reservoir which had been covered with water to a great depth intermittently for about five years prior thereto.

The way may be open to the watermaster in the future to avail himself of this new data and make his formula more scientific. The question of whether he is right or wrong in his method should not be answered by this court but should be left for the state tribunal which entered the decree, where the parties to the original suit can be heard. On the whole, although there may be more natural flow in the Snake at present than there was when the original decree was entered, defendant is receiving the full benefit of "natural flow" as defined by the decree itself. In other words, it is awarded yearly an amount corresponding to what it received in a like year before the decree passed.

■■■■ The conclusion is thus forced upon the court by the language of the state decree and methods adopted thereunder. The matter was litigated in the state courts, and the conflicting rights of the parties thereto were settled in that forum. That court set up an administrative machinery to enforce the decree which it passed. The Deputy Commissioner has adopted a uniform interpretation and has yearly apportioned the water in accordance with that view of the provisions of the decree. This court has no jurisdiction to interfere with the agent so designated for that apportionment. Nor could it make a different decree without the presence of all users to be affected thereby. Up until the state court makes a different determination the plaintiff is not in bad faith in accepting the

water in the quantities allowed by an officer designated by that tribunal.

It is intimated that bad faith is shown by failure of plaintiff to have the state decree modified before now, but the circumstances seem conclusive to the contrary.

There can be no motive on the part of defendant for permitting subsequent appropriators or storage owners to take water to which its own stockholders are legitimately entitled. Everything is against it. Defendant would thus deprive its members of the very life blood of the project, water in July and August, in the face of the knowledge on its part that these stockholders have spent large sums of money individually to insure the supply of late season water. This is contrary to reason. Besides, if the defendant had sold the shares of stock in controversy, it would have profited equally with the plaintiff. It might have been profitable to have released the shares in which defendant was interested and used the money thus obtained in the purchase of storage. Some impelling motive must have prevented it. This influence can only be a sincere belief in the shortage of water.

Conditions of water supply and of storage water have constantly changed in the past few years. Not only that but until recently at least the consensus of opinion has been generally that defendant was getting the proper amount of water under the decree. Mr. Steward, chief expert for the plaintiff, upon this branch of the case, testified that while he was in the employ of the defendant company in 1928, he believed it was getting all the water to which it was entitled under the appropriation. Surely defendant would be permitted to rely upon expert opinion of its own engineer employee even, at that late date, even though he has since changed his mind. Defendant carried on various investigations and assisted in others which attempted to determine the natural flow of the Snake through the various years. It checked up on the probable effect of the establishment of American Falls Reservoir and has consistently collected data. If it should now or hereafter be convinced that an attack should be made in the state court upon the "Foster Decree" or the administration thereunder, a different problem would arise. There is no bad faith toward plaintiff shown in failing to move up to the present.

■ The plaintiff vigorously attacks the present use of water in the Twin Falls District as wasteful and not beneficial. It points to the surface run off and known deep percolation as proof of this fact and requests the court to fix a duty of water for the project as a whole. The court would be reluctant to do this in any event in the absence of the actual water users as parties, in view of the fact that plaintiff itself, by contracting with the state and by the certificates of stock, agreed to furnish each with one second foot of water for each 80, acres of land and therefore it should not be permitted for private advantage to contend that any one of the water users can get along with less, absent definite proof of waste on the individual tract.

Construing the contract between the state and plaintiff, the Supreme Court of Idaho said, in a suit to which both plaintiff and defendant were parties:

"It cannot be presumed that the present users of water under this system, when they acquired their rights to its use, intended or understood that they were to receive only an indefinite fractional part of this original appropriation of 3,000 second feet, instead of the definite, specific quantity mentioned in the granting clause of their contracts. Such meaning is clearly contrary to the language used. If the state, which subject only to the limitations of law had plenary power to fix the terms and conditions of these contracts between the construction company and the settler, intended that he should have only a fractional, indefinite, and uncertain amount of this appropriation that might remain after all subsequent purchasers of lands lying within the exterior boundaries of the segregation had been granted similar rights, it should have made this condition of the contract clear and unequivocal. Instead of doing so, it was made to read as above stated." State & Rice v. Twin F. L. & W. Co., 37 Idaho, 73, 217 P. 252, 256.

■ However, in view of the policy announced as to beneficial use of water in the Constitution of Idaho, no unit holder is entitled to make a wasteful use of the water, and, if any is so doing with the consent of the canal company, this action could be considered upon the question of good faith.

■ But the proof adduced does not attack the use made by an individual water user. Since the state has contracted that each shall receive a stipulated amount and the plaintiff has agreed to furnish that amount and by contract has required defendant to deliver that amount, the court presumes this amount is necessary to each individual tract. The proper method of proving the failure to ap-

ply this amount to a beneficial use is to fix the consumption use of the particular plants which the individual farmer was raising during the particular year, and the permissible or unavoidable waste of a reasonable method of farming the particular plot, and loss in laterals between the main canal and the individual farm.

Plaintiff disregarded this scientific and expensive method of fixing the duty of water. Its testimony is largely the opinions of experts which, while valuable, conflicts with the testimony of other experts and of the farmers who actually apply the water. Besides a great deal of this testimony rests upon speculation and pure assumption. For instance, the charts prepared by plaintiff go upon the assumption that only 167,000 acres are actually irrigated. But since plaintiff was party to the sale of 203,000-acre water rights, it would seem to be required to prove duty based upon that figure. The only proof adduced was crop reports of the area showing 164,682 acres in crop in 1930, and varying amounts in other years. But even though these were all the lands actually irrigated (which was not proven), obviously water furnished to towns, domestic use, watering stock, irrigation of lawns, absorbed by lateral movement and capillary attraction in lands not intended to be irrigated is put to a beneficial use. The opinion of experts should be predicated upon observed facts, and not upon circumstantial assumptions from other facts. No valid proof was submitted upon the subject to the contrary, and therefore the court must take the full area for which water was sold as the basis for figuring the beneficial use.

The significant testimony in the record is that of the farmer witnesses who testify that the crops have burned up or had to be abandoned in the dry years on the Twin Falls tract. Any other testimony is, as far as this record is concerned, pure theory. Therefore the court must hold that plaintiff has not proven that there is an improper duty of water assigned upon the Twin Falls project, and, since the burden is upon it, the case must fall upon this issue.

The plaintiff criticizes the method of farming used, but a reasonable method of farming must prevail and a farmer is not required to use methods which are costly in labor and money simply because some waste can be saved thereby. All farmer witnesses are criticized by plaintiff because it says they use all the water they can get, but even if this were true in all cases, it is probably because the experts in control of irrigation through courts and governmental agencies have often left the farmer with a theoretical perfect supply which in practice would not raise crops. The testimony of the farmer witnesses in this case is condemned because the figures testified to by some of them on cross-examination do not tally with the amount of water which they claimed they used, but the discrepancy was never called to the attention of a single witness and an explanation obtained, nor were any of them asked whether the amounts testified to represented all the water used nor whether more water was obtainable. Plaintiff has not established what was a proper duty of water for each individual user upon the Twin Falls tract, to which it was bound by contract to furnish one-eightieth of a second foot, which it must do before it could give the court any measuring stick as to the project as a whole.

The amount of waste which runs off the Twin Falls tract is not excessive in view of actual losses in the main canals and unavoidable surface waste and deep percolation. The picture painted of the vast lake of water under the tract in the almost impervious lava is a practical reduction to absurdity. The table of ground water is based necessarily upon a few crevises running through the rock from which escape is impossible. In these the water builds up, but the rise in feet does not in the least represent the amount of water under the tract figured as if the solid space were a vast hollow void extending under the whole project, because it is obvious no such condition exists.

As concerns duty of water, defendant was entitled to consider that the Twin Falls project is the outstanding example of a successful irrigation district in America and perhaps the world. If a practical experience be used rather than theoretical experimentation as the test of success, then the future irrigation engineer should learn his lesson from this project rather than criticize its actual duty of water from the viewpoint of the laboratory.

The defendant could take into consideration the fact that plaintiff and the state had set a duty of water in the contract between them and in accordance with the statute and Constitution of Idaho. The contract in suit did not require it to make determination either as to supply or duty of water, but only to sell stock if it should conclude that there was over abundant water "and not otherwise." The plaintiff while it operated the tract applied the contract amount to the land and delivered such amount in accordance with its obligation. The contract in suit shows that defendant was insisting at that time that

the water supply was insufficient to properly irrigate the lands, but in order to save controversy permitted the sale of 5,000 acres more. It steadfastly maintained that position in every document which it filed in court or permitted to become public property until the present day. In State v. Twin Falls Canal Co., 21 Idaho, 410, 121 P. 1039, L. R. A. 1916F, 236, one West applied for water for school lands; defendant denied the application. Action for mandamus was then commenced and defendant placed its case upon the ground that there was no water available. The Supreme Court of Idaho refused to permit this defense to be tried on the facts and directed the defendant to sell the water rights for state lands. Thereafter the defendant obeyed the mandate and sold parcels of real property in accordance therewith until 1922. The lands thus disposed of were either sections 16 or 36, admittedly school lands, or were sold (with a single exception) for $15.50 per acre, showing that the acreage thus alienated was state land. This is proof that the attitude of defendant had not changed. In 1917 defendant in this suit was sued by plaintiff here for failure to dispose of the balance of the shares now in controversy. The same defense of insufficiency of water was interposed and in 1922 the cause was dismissed without prejudice. In the case of State & Rice v. Twin Falls Land & Water Co., 37 Idaho 73, 217 P. 252, defendant upon a showing of insufficient water for the supply of the project was exonerated from further sales. It has never sold any since for a period of ten years. A position thus steadfastly maintained in the face of litigation is strong evidence of good faith.

The fact that purchase of Jackson Lake storage and initiation of a right for flood waters of the Snake in 1916 by the company and the purchase by individuals of American Lake Storage in 1927 and following years would seem at least to guarantee complete belief in a shortage of water in certain years at any rate. There is no doubt among the water users that the whole foot per 80 acres is necessary for proper irrigation. The farmer witnesses so testify and quote instances of dying crops and abandoned fields in short water years.

In view of the fact that it is better for the community and the commonwealth to have four farmers with an abundance of water than to have six farmers in the desert who, in a year of shortage, will lose their crops, defendant is justified in absence of proof of waste on specific tracts in supplying the amount stipulated in the contract between the state and plaintiff and in the agreements between plaintiff and the water users.

But there exist other overwhelming reasons why the prayer of plaintiff's complaint must be denied even if the relation between plaintiff and defendant be fiduciary. First, plaintiff with full knowledge of the facts has itself given a different construction to all the contracts involved and the facts in controversy than that for which it contends in this suit. Second, plaintiff acquiesced in the claim that there was no water available for additional land, although it knew that the water users were making payments to it, in reliance upon its position. Finally, after a definite repudiation by defendant of any obligation to sell additional shares, plaintiff allowed the matter to lie for a number of years before commencing suit.

In the first place plaintiff must be bound by the construction which it has heretofore placed on these numerous agreements. The original contract with the state was construed by the plaintiff when it, for the period of time between the initiation of water supply and the surrender of the system to defendant, delivered to each acre the contract amount of one-eightieth of one second foot, irrespective of any determination of duty or of what crops the land had upon it. In the controversy of 1910, furthermore, it had full power before it made the contract with the defendant, if it believed the facts justified such action, to sell all the additional stock itself and take all the proceeds thereof. Instead, in the face of a serious contention upon the part of the canal company that there was insufficient water for additional land, the construction company chose to turn over the remaining shares to the canal company for a valuable consideration, and with the sole limitation that the latter should dispose of them only if it found, contrary to its contention at the time, that the shares represented surplus water. No sufficient reason has ever been suggested for this paradox, except that neither plaintiff nor defendant believed that there was available water to supply additional shares after the contract of 1910, except perhaps in small quantities. Thus the action of plaintiff in making the contract in suit is a valuable piece of construction of its agreement with the state.

A still more significant fact is found in the clause of the agreement of 1910, which relates to the reversion of the allotted lands to the United States. Incontrovertibly in the contemplation of both parties the question as to the water rights was to be settled before the

time of such prospective retransfer. It is clear the parties intended by paragraph numbered 5 to provide that the surplus water rights still existing, if any, were to be sold in the Carey Act segregation and before its relinquishment, and plaintiff was not to have the segregation extended for the purpose of sale thereof. As a corollary, the proposition is evident that if, at the time of the retransfer of the segregation to the United States, any share remained unsold, it should be void. This is a plain contractual limitation. The subsequent course of events shows that the bar established by the agreement itself prevents further sales. The cancellation of the segregation was not in fact pressed by defendant, but for various reasons extended until 1927, when the United States finally made demand for relinquishment upon the state of Idaho. The Department of Reclamation wrote to the plaintiff company and Mr. Milner asking as to the attitude of the company and received definite assurance from the company that there was no objection to the turning back of the lands. Thereupon and upon that basis appropriate conveyance was made by the state to the government. This action seems to be a conclusive construction of the instant contract by plaintiff. The very purpose of binding it not to object to the retransfer of the segregated lands to the government was to set a limit to its claims to have additional water rights sold. It did not object and the bar became absolute.

The second reason for preventing plaintiff from pursuing the instant remedy was in the nature of estoppel. One of the affirmative defenses is that the plaintiff made no motion to have the construction contended for by it placed upon the agreement until defendant and the water users had materially changed position. Plaintiff was bound to have an ample supply of water under the state contract and the court decisions in order to assure its collections upon the lands already sold. If it had itself oversold the project, shortage of water could have been used as a defense to enforcement of its liens. By allowing defendant and the water users to believe that it acquiesced in the proposition that there was no water available for further distribution, plaintiff induced the contract holders to complete the payments. Since, as has already been noted, all shares sold have a pro rata interest in the works and the appropriation itself, it would be inequitable for the court to permit plaintiff, after reaping a handsome profit on its original investment through payments made by settlers based upon the supply of water which each was presently receiving, to diminish the amount each settler would be permitted to use, many years later and for private gain of plaintiff.

Finally all these facts might be taken into consideration in dealing with the defense of laches which is also affirmatively pleaded. No one knew better than the plaintiff the facts concerning supply and duty of water on this very project at the time it was turned over to defendant. Likewise it is not shown that plaintiff's present information concerning these very elements upon the project could not have been obtained at any time in the past twenty years. In fact it is obvious all the essentials could have been. Plaintiff has known all this time that defendant had contended that there was no water available for the sale of additional stock. This court has found that contention has been made in good faith. It is true defendant did sell additional stock for state lands. But this was done under compulsion of the mandate of the state court, and cannot be held to be a construction of the contract upon its part nor a deviation from its contention that no further water was available.

Plaintiff made no direct effort to have further stock sold until the suit filed by it in 1917. It then had possession of most of the facts which it uses now. Furthermore, the conditions upon the Snake had not been entirely changed by the construction of American Lake as they have at present. In that suit the canal company defended upon the ground that there was insufficient water to permit of the sale of additional stock. About the time of the presentation of the case of State & Rice v. Twin Falls Land & Water Co., supra, the suit was dismissed without prejudice. Of course, that decree of dismissal does not present the bar of res adjudicata, but, in view of plaintiff's inaction for ten years thereafter, sheds a valuable light upon the attitude and the construction which it then placed on the agreement of 1910.

The Rice Case above mentioned is one of the land marks in this controversy and constitutes one of the chief reasons why at this late date plaintiff should not be heard to urge that there is sufficient water to serve additional land. There an action of mandamus was brought by Rice, a purchaser of state lands susceptible of irrigation by the Twin Falls Canal, and the state of Idaho against the construction company and the canal company. Each answered and demurrers were filed to the answers. The Supreme Court directed, in reversing the decision of the lower

court that "the cause may be heard upon any of the issues of fact thus tendered" if it were desired. The law applicable was announced by the court in the syllabus and adopted by the opinion.

"Where a contract between the state and a Carey construction company provides that in no case will water rights or shares be dedicated to any of the lands in said system, or sold, beyond the carrying capacity of the canal, or in excess of the appropriation of water, neither the construction company nor the operating company can be required to sell additional rights after the carrying capacity of the system or the appropriation has been sold to prior users."

It is true the Rice Case is not pleaded as res adjudicata, but the original record clearly shows plaintiff here was supporting Rice's claim against the canal company. The cause was decided upon the pleadings but opportunity was offered to contest the issue upon the facts, but neither Rice nor the construction company sought then or later to controvert the allegation. The Supreme Court of Idaho determined upon that state of facts that the canal company need sell no more stock. The proof shows that the canal company acted upon that decision and has sold no more stock from that day to the present. The record shows that the construction company made no move or demand upon the canal company from the date of that decision until the filing of this suit in 1930.

The issue of sufficiency of water was concluded in the Rice Case as to the state and possibly even as to plaintiff, but this phase will not be considered as it is not so pleaded. But in any event, after over seven years acquiescence in the position taken by defendant and found true by the Supreme Court of Idaho in a suit to which plaintiff was a party the latter should not be permitted now to recontest the issue.

The court finds from the first an insistence by defendant that there was no more water than was necessary for the irrigation of the lands then under water. After the dismissal of plaintiff's suit and the decision in the Rice Case, supra, defendant took an absolute position and repudiated all plaintiff's claims under the contract except that it continued to collect and disburse money upon the tracts which had already been sold. Plaintiff's acquiescence in this position for seven years is a final bar.

Plaintiff has outlived its usefulness to the Twin Falls project. It did a great work and the public has benefited thereby. It has been apparently well paid for its pains. At present it seeks a profit without corresponding benefit. Approximately a fifth of a century has rolled by between the making of the contract and suit upon it, during which time plaintiff with full knowledge has acquiesced in the construction of this contract and the facts by defendant. In this period of time too much water has flowed past Milner Dam for plaintiff to change its position now.